LAURA NOTT DOWSETT, LIFE BENEFICIARY, AND SHERMAN N. DOWSETT, REMAINDER-MAN *v.* HAWAIIAN TRUST COMPANY, LIMITED, AS TRUSTEE OF THE TRUST ESTATE OF HERBERT M. DOWSETT, CREATED DECEMBER 31, 1935.

No. 4306.

May 28, 1964.

Tsukiyama, C. J., Cassidy, Wirtz, Lewis and Mizuha, JJ.

OPINION OF THE COURT BY WIRTZ, J.

This is an appeal from the judgment of the circuit court, first circuit, entered on January 22, 1962, denying plaintiffs' claim of surcharge against defendant trustee for having sold, between 1948 and 1955, 2,771 shares of Honolulu Oil and 503 shares of American Factors, Limited, allegedly contrary to the terms of the inter vivos trust created by Herbert M. Dowsett on December 31, 1935.

The provisions of the trust instrument assertedly violated appear in paragraph 6 and the pertinent portions thereof follow:

"6. The Trustee shall have *full power and authority* to manage and control the property from time to time included in said trust estate, *to sell* at public or private sale, to exchange, to borrow, to pledge, and to invest and reinvest. * * * The Settlor expressly declares that the shares of corporation capital stock hereby assigned by him to the Trustee have proved satisfactory investments during a considerable period of time and that *he does not wish them sold unless the Trustee in its discretion shall think it clearly advisable because of changing conditions or other special reasons.* The Trustee shall not be held liable for any loss to the trust estate resulting from the retention of said stock by it." (Emphasis added.)

The original assets of the trust estate included various securities, of which the two in question constituted 65.2% (American Factors being 32.1% and Honolulu Oil 33.1%) of the total value of $170,688 at inception. After the last questioned sale and by the end of 1955, the value of the trust estate had risen to $545,790.

The portfolio of the trust estate was subject to continuous periodic review by the trustee's investment department, investment review committee and the responsible trust officer. Growing concern was expressed about the

ever increasing concentration of Honolulu Oil stock, although the trustee refrained from diversification in deference to the expressed wishes of the settlor. After thirteen years, from 1935 to 1948, this concentration of Honolulu Oil stock had increased from 33% to 66% by June of 1948 when the trustee proceeded to diversify through periodic sales of the stock thereafter. During this same period the value of the American Factors, Limited stock declined from 32% to 5.6% of the assets of the trust estate due to a decline in the market price. The sale of the American Factors, Limited stock in 1954 and 1955 at a loss was utilized to reduce the capital gains on the sale of the Honolulu Oil stock. After all sales were concluded and reinvestments made, as of December 31, 1955, the Honolulu Oil and American Factors, Limited holdings were 38.6% and 4% respectively, of the value of the assets of the trust estate.

At the time of making each of the several sales of Honolulu Oil, in addition to its apprehensiveness about the overconcentration of this stock in the trust portfolio, the trustee was concerned about numerous reports it had received from mainland authorities showing significant changes in the oil industry during this period, including the fact that the United States had shifted from a net exporter to a net importer of oil, the increasing costs of finding new oil, the institution of production controls, and the uncertainty of continued favorable prices for oil stocks.

In addition to the tax incentive to sell American Factors, Limited stock at a loss to reduce the capital gains received from the sale of Honolulu Oil, the trustee was aware that the chief source of the company's income was from agriculture, the production and sale of sugar, and from merchandising. Through the unionization of labor as a result of the 1946 sugar strike, the industry faced higher

costs of production despite a stabilized price for sugar. The margin of profit in merchandising had also been narrowed through increasing competition.

Initially, the question raised under this appeal is whether, as contended by the plaintiffs-appellants, the language above quoted from the trust instrument mandated the retention of the securities in question in the trust estate.

The plain meaning of the words used by the settlor that "he does not wish them sold" clearly expressed his desire these inception securities in question be retained. They bespeak his inclination rather than his dictation.[1] The exculpatory clause[2] following this language merely amplified the expressed desire but in no way enlarged the request to embrace the rigidity of a command. The settlor himself dispelled any notion of a mandatory retention of the inception assets of the trust as he clearly envisioned and provided for their disposition in the event of "changing conditions or other special reasons." A mandate to retain the inception assets of a trust estate would be incompatible with the grant to the trustee of the power to sell such assets, even though such power of sale be limited. *In re Flanagan's Will*, 184 Misc. 938, 55 N.Y.S.2d 200; *In re Herb's Estate*, 163 Misc. 441, 296 N.Y. Supp. 491. *Cf.,*

---

[1] His testimony reflected his sole concern for the welfare of his children who were beneficiaries under the trust as the remaindermen.

The inclusion in the trust document of the language—"The Settlor expressly declares that the shares of corporation capital stock hereby assigned by him to the Trustee have proved satisfactory investments during a considerable period of time and that he does not wish them sold"—was at the settlor's insistence. To this language the trustee added the following: "* * * unless the Trustee in its discretion shall think it clearly advisable because of changing conditions or other special reasons." Whereupon the settlor tried unsuccessfully to attach thereto a veto power in favor of his beneficiaries in this language: "* * * but not without the consent of the four beneficiaries, children of the Settlor."

[2] "The Trustee shall not be held liable for any loss to the trust estate resulting from the retention of said stock by it."

*Estate of James Campbell,* 42 Haw. 586. The settlor's language signifies discretion and authority rather than absolute prohibition.

The power of sale here given to the trustee is not inconsistent with the settlor's expressed desire of retention. While by the latter provision he requests retention of the inception securities, he does not prohibit their sale whenever "in its discretion [the trustee] shall think it clearly advisable because of changing conditions or other special reasons." Where there is a grant of authority to a trustee to sell trust assets but the exercise of such authority is limited to certain contingencies to be determined by the trustee, such determination will not be disturbed by the court in the absence of a showing of abuse of discretion on the part of the trustee. *Estate of James Campbell, supra.*

This does not mean, as plaintiffs complain, that the trustee in its exercise of the power of sale was not subject to control by the chancellor. 2 Scott, *Trusts,* § 187 (2d ed. 1956). "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Restatement (Second), *Trusts,* § 187 (1959). In discussing what constitutes an abuse of discretion, the American Law Institute has this to say:

"If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment." Restatement (Second), *Trusts,* § 187, comment *e* (1959).

This rule and attendant principles were fully accepted by this court in *Estate of James Campbell, supra,* 42 Haw.

586, in confirmation of the ruling made in *Hyde* v. *Smith*, 11 Haw. 535.

The plain language of the trust instrument quoted above gave the trustee a power of sale as to the securities in question but limited the trustee in the exercise of its discretion to a prior determination that the specified conditions, namely "changing conditions or other special reasons," existed making the sale "clearly advisable." The exercise of the power of sale was thus limited as to these securities to a situation which the trustee, "in its discretion," considered "clearly advisable" and then only if "changing conditions or other special reasons" made it so.

In discussing the use of such a guide to assist in determining whether the trustee has abused its discretion, the American Law Institute makes the following comment:

> "If there is a standard by which the reasonableness of the trustee's judgment can be tested, the court will control the trustee in the exercise of a power where he acts beyond the bounds of a reasonable judgment, unless it is otherwise provided by the terms of the trust.
>
> \*    \*    \*    \*    \*    \*    \*
>
> "This rule is applicable where the power is to be exercised under certain circumstances the existence of which is to be determined by the exercise of the judgment of the trustee."

Restatement (Second), *Trusts,* § 187, comment *i* (1959); 2 Scott, *Trusts,* § 187.2 (2d ed. 1956); *cf., State* v. *Strong,* 185 S.C. 27, 192 S.E. 671.

Where the settlor has thus limited the exercise of discretion by the trustee to conformance with an expressed standard of conduct, one of the factors in determining whether there has been an abuse of discretion is "the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be

judged." Restatement (Second), *Trusts,* § 187, comment *d* (1959). The standard of "changing conditions or other special reasons" set forth in the trust instrument as a guideline, under the circumstances surrounding its inclusion therein (as testified to by the settlor[3]), envisioned little more than the standard of conduct required by the "prudent investment rule." This rule is best stated in the statute:

> *"Investments.* (a) Fiduciary accounts. In acquiring, retaining, exchanging, selling, investing, reinvesting and managing property of another, including investments for account of their trusts by trust companies acting as trustees or guardians, a trust company shall exercise the judgment and care which, under the circumstances then prevailing, men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds and property considering both probable income and probable safety of capital." R.L.H. 1955, § 179-14.

It is readily seen that the purpose of this rule is to protect not only the interest of the life tenant by providing the maximum income from the capital of the trust but also that of the remaindermen in safeguarding the capital.

While the standard of "changing conditions or other special reasons" defies exact definition, still it does present a faintly discernible guideline of conduct for the exercise of reasonable judgment. The conditions or reasons must have been nonexistent at the time of the assignment of the securities in question to the trustee but must have originated or occurred subsequent thereto. "Changing conditions" refers to such as make it inadvisable to retain the securities in question while "special reasons" make it advantageous to dispose of them. The indefiniteness of

---

[3] See footnote one, *ante.*

such standard of conduct places but a slight curb on the trustee's discretion in the exercise of reasonable judgment.

With these principles in mind we turn to a consideration of the findings of fact made by the chancellor as affected by the evidence adduced. The hearing had in the court below encompassed the events and circumstances leading up to and surrounding the questioned sales transactions. After a comprehensive review of the trustee's actions the chancellor made the following findings of fact: He found Honolulu Oil and American Factors stock at inception constituted 65.2% of the total; that the trustee regularly reviewed the portfolio; that the national investment services reported surplus of oil between 1947 and 1955 and the vulnerability of crude oil producers; that from 1935 to 1948 the concentration in Honolulu Oil rose from 33% to 66% of the total value of the trust; that based on the credibility of the witnesses and the weight of the evidence the court found that changing conditions and other special reasons existed for the sales; that the "changing conditions" in the oil industry from 1947 through 1955 involved a change in the status of the United States from that of exporter to importer, a shift of the major world reserves in oil from the United States to foreign countries, sharply increased production costs due to the necessity of drilling deep rather than shallow wells as heretofore, the vulnerabiltiy of domestic crude oil producers to sharp price reductions with the resultant favoring by investment counselors of integrated oil companies over producers of crude oil such as Honolulu Oil; that the "changing conditions" in the sugar industry from 1949 through 1955 involved its complete unionization, the 1949 waterfront strike, and a general reduction of earnings of sugar enterprises which constituted the major portion of the business of American Factors; that in addition thereto a "special reason" for the sale of American Factors stock was the

advantage of offsetting for tax purposes the capital loss from such sale against the capital gain realized from the sales of Honolulu Oil; that the trustee acted in good faith, was not guilty of negligence and its determination to sell was not an abuse of discretion; that plaintiffs received regular accounts each year reporting the sales and inviting questions and made no complaint until eight years after the first sale occurred.

These findings find ample support from the evidence in the record. We consequently cannot say they were "clearly erroneous" under Rule 52, H.R.C.P. The scope of review prescribed by the rule[4] limits the right to reject the findings of the trier of fact, both in equity and at law, only when firmly convinced that a mistake has been made. *Filipino Fed. of America, Inc.* v. *Cubico,* 46 Haw. 353, 380 P.2d 488; *Peine* v. *Murphy,* 46 Haw. 233, 377 P.2d 708; *Miller* v. *Loo,* 43 Haw. 76; *Lum* v. *Stevens,* 42 Haw. 286.

Plaintiffs take the view that the trustee over-emphasized the importance of the increased concentration of Honolulu Oil stock, which was due to its enhanced value. The risks of concentration and the benefits of diversification are accepted rules of prudent trust management under the "prudent investment rule." *Cf.,* Nos. 4274, 4275 and 4276, *Steiner* v. *Hawaiian Trust Co.,* decided this date at page 548 *ante.* The increase in concentration of Honolulu Oil stock from 33% to 66%, in itself a significant consideration, taken in conjunction with the other factors affecting Honolulu Oil found by the chancellor to have existed at the time of the sales rendered these sales "clearly advisable" in the exercise of reasonable judgment.

The factors found by the chancellor to have affected the stability of American Factors stock presented an ex-

---

4 Rule 52(a), H.R.C.P., provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

cellent reason to replace this stock in the portfolio while likewise affording an opportunity to enjoy a tax benefit by offsetting the taxable gain made on the sale of Honolulu Oil with the loss sustained through this sale of American Factors stock. Again, this combination of "changing conditions" and "special reasons" made the sale "clearly advisable" in the exercise of reasonable judgment.

The fact that the trustee's judgment was not vindicated over the passage of years, in that the trust assets have not increased in value more than they actually did, does not render it less reasonable. After a lapse of eight years from the date of the sales, during which time no protest or criticism was lodged against the trustee's actions, the plaintiffs, armed with the certitude of hindsight, sought to surcharge the trustee because the securities sold had risen in value in the meantime although the substitution of other securities in their place entailed no loss to the trust. To assert that the trustee here should be surcharged because the trust corpus only increased from almost $171,000 in 1935 to over $900,000 in 1961 is to require omniscience by the trustee in its predictions on the future of the stock market.

On the basis of the above findings of fact by the chancellor we can only conclude in applying the foregoing principles of law, that the trust instrument gave the trustee power to sell, in its discretion, the securities in question when it had determined that sales were "clearly advisable" because of "changing conditions or other special reasons" existing at the time of each sale. The determination of the existence of "changing conditions or other special reasons" was for the trustee to make and could not be disturbed by the imposition of the court's judgment in the absence of a showing of an abuse of discretion. No showing had been made that the trustee, in the exercise of its power of sale,

had exceeded the bounds of reasonable judgment in determining that "changing conditions or other special reasons" did exist to make the sales "clearly advisable."

Affirmed.

*Robert G. Dodge* (*Heen, Kai & Dodge* and *Dudley Harkleroad,* San Francisco, Calif.) with him on the briefs for plaintiffs-appellants.

*J. Garner Anthony* (*Robertson, Castle & Anthony* and *Anderson, Wrenn & Jenks* with him on the brief) for defendant-appellee.