MATSUO TAKABUKI, Trustee of the Estate of Bernice Pauahi Bishop, Plaintiff, Counterclaim Defendant-Appellee, Cross-Appellant, Cross-Appellee, *v.* HUNG WO CHING, in his capacity as Trustee of the Estate of Bernice Pauahi Bishop, Defendant, Counterclaimant-Appellant, Cross-Appellee, and HUNG WO CHING, individually, Defendant, Cross-Appellee, Cross-Appellant, and TANY S. HONG, Attorney General of the State of Hawaii, Defendant

NO. 8967

(CIVIL NO. 62436)

FEBRUARY 14, 1985

NAKAMURA, ACTING C.J., HAYASHI, JJ., INTERMEDIATE APPELLATE COURT ASSOCIATE JUDGE HEEN, IN PLACE OF PADGETT, J., RECUSED, INTERMEDIATE APPELLATE COURT ASSOCIATE JUDGE TANAKA, IN PLACE OF LUM, C.J., RECUSED, AND CIRCUIT JUDGE KLEIN, IN PLACE OF WAKATSUKI, J., RECUSED

516

OPINION OF THE COURT BY NAKAMURA, J.

A clash of views over the acquisition of a building to house the offices of the Estate of Bernice Pauahi Bishop culminates in an appeal by Ex-trustee Hung Wo Ching and a cross-appeal by Trustee Matsuo Takabuki from a judgment and order of the Circuit Court of the First Circuit on Takabuki's "Bill for Instructions and Claim for Surcharge Against Hung Wo Ching" and the latter's "Counterclaim" seeking relief of like character. The court con-

cluded after trial that it lacked power to adjudge "the propriety of the Trustees' exercise of discretion in their acquisition of Kawaiaha'o Plaza" since "at least three of the Trustees [had not sought] a determination of that issue."[1] Nevertheless, it proceeded to review the transaction and trustee conduct relative thereto, found a "genuine dispute continues to exist among the Trustees with respect to matters relating to their acquisition of Kawaiaha'o Plaza," and ordered the Attorney General[2] "promptly to convey and transmit [its] Instructions to the Trustees." We conclude the circuit court erred in subjecting the Trustees' conduct to scrutiny and directing them to embark on a particular course of action.

## I.

### A.

The Trustees of the Estate of Bernice Pauahi Bishop were given notice in late 1976 of the State of Hawaii's intention to institute eminent domain proceedings to acquire the site of the Estate's office building, which was within the Hawaii Capital District, for a public use. This came as no surprise, inasmuch as they had been aware of the State's plan to do so for some time and the relocation of the Estate's offices had been under study.

They initially referred the problem for study in 1973 to the Estate's staff, who recommended the construction of an office

---

[1] Neither disputant named any other trustee as a defendant, and the court chose not to make the remaining trustees parties in the proceedings. Evidently, they want no part of the dispute.

In an amicus brief submitted to this court, Trustees Richard Lyman, Jr., Myron B. Thompson, and William Shaw Richardson urge that the circuit court's order be declared void and of no effect. They aver the court misapprehended its role and usurped their function. "It is not the function of the court," they claim, "to exercise the business judgment of the Trustees, or to intervene in approving or vetoing their decisions."

[2] The Attorney General was a party in the proceedings since he had been named a defendant in Takabuki's suit.

building on the campus of the Kamehameha Schools on Kapalama Heights. But the prevailing sentiment among the Trustees was for a headquarters location closer to downtown Honolulu, Ching being the lone Trustee favoring the staff suggestion. The factors tipping the balance in favor of the downtown location were easy access to government and business offices and a desire to replace what would be lost through condemnation with "commercial" property capable of yielding a return on investment. The discussion of alternative relocation sites continued without decision between 1975 and 1977.

During this period, the Kawaiahaʻo Plaza Associates, a limited partnership whose managing general partner was James Trask, was attempting to bring to fruition a project for the construction of an office building at the edge of downtown Honolulu, but was encountering difficulty. Early in 1977, Trask approached the Trustees with an offer to sell them an interest in the planned office building. Its location near the center of government and business activity in Honolulu engendered much interest in Kawaiahaʻo Plaza among the Trustees. Takabuki, characterized by the circuit court as one with "considerable competence, expertise and special skills in legal matters, business, and in development of real estate," was assigned the task of studying Trask's proposal and commencing negotiations with him.

Though Takabuki assumed primary responsibility, he invited the participation of other Trustees. Trustees Thompson and Lyman attended the bargaining sessions at times, and Ching was present at a single session in October of 1977. Takabuki, however, kept his colleagues abreast of developments in his discussions with Trask.

Trask was hardly a stranger to the Trustees, for he was a director of the Helumoa Corporation which they organized to develop estate-owned real property in Waikiki. They knew of his experience and expertise in matters related to real estate and property development. But they also knew Kawaiahaʻo Plaza Associates and its principal partners, Trask and Francis Denis, were in financial straits. The bargaining between their representative and the developers thus entailed the discussion of numerous proposals and financing arrangements which took this into account. From August

of 1977, the discussions centered on a plan of co-ownership of Kawaiahaʻo Plaza.

The financial condition of the developers continued to deteriorate in September and October, and their project was on the brink of disaster. Takabuki and Trask stepped up negotiations and expedited the preparation of a draft agreement for the Trustees' perusal. The draft agreement reflected the developers' inability to complete the project without the participation of the Estate. It called for a purchase of the land in fee by the Trustees, a "lease back" of the land to the developers, a purchase by the Trustees of a sixty percent interest in the "leasehold premises" consisting of the leased land and the building, and a complicated financing arrangement. In Takabuki's opinion, the developers' precarious financial plight and impending legal actions against them rendered imperative a prompt decision, one way or the other, on the acquisition of the property. He therefore had the matter placed on the agenda of the Trustees' meeting scheduled for Thursday, October 27, 1977.

The Trustees present at the meeting were Takabuki, Thompson, Lyman, and Frank B. Midkiff, who subsequently retired and has been replaced by William S. Richardson. Ching did not attend, since he customarily attended other business meetings on Thursdays; nor did he seek deferral of the matter to a more convenient time. Those present were apprised of the provisions of the draft agreement, and the significant aspects of the transaction, as well as its ramifications, were reviewed and discussed in detail. And on Takabuki's recommendation, the acquisition of Kawaiahaʻo Plaza was approved, subject to a confirmation of the staff's opinion of the value of the sixty percent interest in the "leasehold premises" by an independent appraiser and an approval of the form and substance of the agreement by the Estate's tax counsel.

When Ching learned his colleagues had tentatively approved the agreement, he quickly voiced objections to particular provisions therein. Ching, described by the circuit court as having "considerable competence, expertise, and special skills in finance and business," was troubled by the developers' unstable financial situation and the Estate's potential liability in the event of their default. He subsequently put the objections in writing, outlining his concerns in detail, and also told his colleagues the acquisition of Kawaiahaʻo

Plaza was not in the Estate's best interests. But the others were of the opinion that the agreement's default provisions protected them, and they signed it on December 6, 1977, after the conditions laid down at the meeting of October 27, 1977 had been fulfilled.

The execution of the agreement did not write an end to the discord; and on Thompson's suggestion, a consultant, Gilbert Root, was engaged to evaluate the acquisition as an investment. In Root's opinion, several provisions of the agreement rendered the transaction "questionable as a sound fiduciary investment." He recommended a restructuring of the agreement in view of the apparent difficulties the developers had been experiencing in meeting their obligations and the Estate's potential liability on the long-term loan.

As the project neared completion in late 1978, the developers' inability to meet their financial obligations became more pronounced. And the agreement was restructured so the Trustees would be the full owners of the "leasehold premises," rather than of only a sixty percent interest. The developers were compensated by the grant of a prepaid lease of the former Libby cannery site in Kapalama. The Trustees in turn were accorded a preferred security position on the lease. Ching and Midkiff abstained from signing the amended purchase agreement.

Kawaiaha'o Plaza Associates, however, still could not fulfill its end of the bargain; it was unable to convey the property to the Trustees free of encumbrances. To relieve the developers of some of their financial burden and enable them to effect a transfer of title as agreed, a majority of the Trustees composed of Takabuki, Thompson, and Lyman relinquished the Estate's preferred security position in the "Libby lease" to a creditor. Takabuki agreed to personally indemnify the Trustees to the extent of $250,000 if Kawaiaha'o Plaza failed to fulfill its obligations to creditors. Under the terms of an agreement with Midkiff, Thompson, and Lyman, he "deposited with the Trustees [certain] negotiable securities [he owned] and . . . grant[ed them] the irrevocable right to cash and/or sell all or any part thereof from time to time as is necessary to make good any moneys which KPA shall fail to pay or repay."

The developers were able thereafter to complete the project and convey the "leasehold premises" free of encumbrances to the Trustees. The Trustees and staff of the Estate moved into their new offices at Kawaiaha'o Plaza in June of 1979.

 

## B.

The completion of the project did not abate the dissension at Kawaiahaʻo Plaza. Ching's opposition to the transaction was steadfast, and he carried the conflict to other arenas. He lodged a protest with the Attorney General of the majority decision to acquire Kawaiahaʻo Plaza. The State's highest legal officer, whose duties include the oversight of charitable trusts and their trustees, saw no reason to initiate State action.[3] But Ching was not deterred from his resolve to have the agreement set to naught.

He retained private counsel and other consultants to review the transaction. Relying on their advice, Ching brought suit against Takabuki, Trask, Denis, and Kawaiahaʻo Plaza Associates in the United States District Court for the District of Hawaii. He averred, *inter alia,* that Takabuki "was acting under color of state law to deprive the Estate and its beneficiaries of certain rights secured to them by the Constitution and laws of the United States" and this conduct "jeopardized the tax exempt status of the Estate."

Purporting to rely on the federal court's pendent jurisdiction, Ching sought plenary review of the conduct of his fellow Trustees. He alleged: (1) Takabuki "repeatedly breached his [fiduciary] duties as Trustee by the manner in which he participated in, negotiated, and purported to act on behalf of the Estate in the purchase . . . of the Kawaiahao Plaza project"; (2) "[a]s recipients of an unconscionable and windfall profit to themselves, and to the detriment of the Bishop Estate, Defendants TRASK, DENIS and KPA are responsible for repaying such unconscionable and windfall profits"; and (3) Plaintiff Ching "is . . . under a compelling legal duty to bring the present action," for "where he learns of any fact indicating or suggesting misconduct, mis-management or mis-application of trust funds by any of his co-Trustees, [he must]

---

[3]

The function of the attorney general, as *parens patriae* of charitable trusts, is to oversee the activities of the trustees to the end that the trust is performed and maintained in accordance with the provisions of the trust document, and to bring any abuse or deviation on the part of the trustees to the attention of the court for correction.

Midkiff v. Kobayashi, 54 Haw. 299, 335-36, 507 P.2d 724, 745 (1973) (citing Hite v. Queen's Hosp., 36 Haw. 250, 262 (1942) ).

take all steps necessary to prevent such conduct, including the commencement of litigation."

But Ching's efforts to overturn the decision of his colleagues were again frustrated. The federal court viewed the Trustees' dispute as a matter primarily of state concern and dismissed the complaint, finding "Plaintiff failed to show that this Court has federal subject matter jurisdiction over the issues raised" and "that it would be incongruous for the court to retain pendent jurisdiction [over the state claims]."

Takabuki filed his "Bill for Instructions and Claim for Surcharge Against Hung Wo Ching," concededly a defensive maneuver, shortly after the federal court refused to entertain his adversary's suit. He purported to sue "in his capacity as a Trustee of the Bishop Estate . . . request[ing] instructions from [the circuit court]." He named as defendants the Attorney General of the State of Hawaii[4] and Hung Wo Ching, "in his capacity as Trustee of the Estate of Bernice Pauahi Bishop and individually." And he prayed for a determination "that the investment in the Kawaiaha'o Plaza was within the discretion of the trustees" and "Defendant Ching's claims [of a breach of trust] are unsound." Additionally, he sought an allowance of attorney's fees and costs incurred in his defense of the federal suit, similar allowances for himself and the majority Trustees for fees and costs to be incurred in the instant suit, and a surcharge of the fees and costs against Ching.

Ching quickly responded with a counterclaim, suing "in his capacity as a Trustee of the Estate . . . against MATSUO TAKABUKI, in his capacity as a Trustee of the Estate." Its averments in essence reiterated those in the abortive federal suit. It prayed for a rescission or reformation of the amended Kawaiaha'o Plaza purchase agreement and for instructions to the Trustees "to take appropriate action . . . to recover . . . any excessive profits received by [Kawaiaha'o Plaza Associates and its partners] from the Bishop Estate incident to the [transaction]." Like Takabuki, Ching further prayed that his opponent be surcharged "in such amounts as the evidence at trial shall show the Estate to have been damaged,

---

[4] The Attorney General answered Takabuki's complaint by admitting certain allegations but denying knowledge of most of the material allegations therein. He has taken no other legal action with respect to the dispute.

including the costs and attorneys' fees incurred in bringing this action."

After the feuding Trustees completed their discovery and the circuit court disposed of their pre-trial motions, including one in which Takabuki unsuccessfully sought the dismissal of Ching's counterclaim for want of indispensable parties,[5] the case proceeded to trial before the court. The lengthy bench trial portended by the extensive and exhaustive pre-trial search for evidence commenced on February 1, 1982, and continued until March 10, 1982.

## C.

The court filed its "Findings of Fact, Conclusions of Law, Judgment and Order" on October 20, 1982. It entered eighty-one findings covering all aspects of the dispute between Takabuki and Ching from its genesis in 1973 when the Estate's staff at the behest of "the Trustees conducted a study of possible areas for relocation of their offices." It concluded it had jurisdiction to act in the case by reason of "§ 560:7-201 and 560:7-306, HRS, as amended"[6] but "[u]nder Decedent's trust and applicable statutory provisions, the

---

[5] Takabuki's contention here was that the counterclaim was subject to dismissal because Ching was seeking a rescission or reformation of the amended purchase agreement yet failed to name the parties to the agreement, Kawaiahaʻo Plaza Associates and the Bishop Estate, as defendants. His specific claim regarding the joinder of the Estate was that the will of the Princess Bernice Pauahi Bishop expressly provided her Trustees could only act when at least three of them joined in the action and "the rule that multiple Trustees can only act as a unit is settled," citing Richards v. Midkiff, 48 Haw. 32, 40-41, 396 P.2d 49, 55 (1964).

[6] Hawaii Revised Statutes (HRS) § 560:7-201 (1976) (emphasis added) reads:

Court; jurisdiction of trusts. (a) The court has jurisdiction of proceedings initiated by trustees and interested persons concerning the internal affairs of trusts. Proceedings which may be maintained under this section are those concerning the administration and distribution of trusts, the declaration of rights and the determination of other matters involving trustees and beneficiaries of trusts. These include, but are not limited to, proceedings to:
(1) Appoint or remove a trustee;
(2) Review trustees' fees and to review and settle interim or final accounts;
(3) Ascertain beneficiaries, to determine any question arising in the administration or distribution of any trust including questions of construction of trust instruments, *to instruct trustees*, and to determine the existence or nonexistence of any immunity, power, privilege, duty or right; and

Court [could not] determine the question of the propriety of the Trustees' exercise of discretion in their acquisition of Kawaiaha'o Plaza."[7] Thus it held "the only proper questions before the Court relate[d] to the propriety of the conduct of Plaintiff, individually, as raised in the allegations of the Counter-Claim, and Counter-Claimant, individually, as raised in the allegations of the Complaint."

The court found neither blameworthy; the business and fiduciary judgments of the disputants were vindicated, but ironically, the judgment of the Trustees as a group was not. "Neither the preponderance of the evidence nor the weight of the proof," the court concluded, "indicates that Plaintiff acted in bad faith or broke

(4) Release registration of a trust.

(b) Neither registration of a trust nor a proceeding under this section result in continuing supervisory proceedings. The management and distribution of a trust estate, submission of accounts and reports to beneficiaries, payment of trustee's fees and other obligations of a trust, acceptance and change of trusteeship, and other aspects of the administration of a trust shall proceed expeditiously consistent with the terms of the trust, free of judicial intervention and without order, approval or other action of any court, subject to the jurisdiction of the court as invoked by interested persons or as otherwise exercised pursuant to law.

HRS § 560:7-306 (1976) reads:

Personal liability of trustee to third parties. (a) Unless otherwise provided in the contract, a trustee is personally liable on contracts entered into in his fiduciary capacity in the course of administration of the trust estate.

(b) A trustee is personally liable for obligations arising from ownership or control of property of the trust estate and for torts committed in the course of administration of the trust estate.

(c) Claims based on contracts entered into by a trustee in his fiduciary capacity, on obligations arising from ownership or control of the trust estate, or on torts committed in the course of trust administration may be asserted against the trust estate by proceeding against the trustee in his fiduciary capacity, whether or not the trustee is personally liable therefor.

(d) The question of liability as between the trust estate and the trustee personally may be determined in a proceeding for accounting, surcharge or indemnification or other appropriate proceeding.

[7] The will of Princess Bernice Pauahi Bishop provides in relevant part:

I direct that a majority of my said trustees may act in all cases and may convey real estate and perform all of the duties and powers hereby conferred; but three of them at least must join in all acts. I further direct that the number of my said trustees shall be kept at five . . . .

Will of Bernice Pauahi Bishop cl. 14 (Oct. 31, 1883), *reprinted in Wills and Deeds of Trust, Bernice P. Bishop Estate, Bernice P. Bishop Museum, Charles R. Bishop Trust* 15, 19 (3d ed. 1957).

his individual fiduciary duties with respect to the Trustees' acquisition of Kawaiaha'o Plaza."[8] Regarding his opponent, its conclusion similarly was that "[n]either the preponderance of the proof nor the weight of the proof suggests that Counter-Claimant acted in bad faith or broke his fiduciary duties either in his conduct relating to the Trustees' acquisition of Kawaiaha'o Plaza or in asserting action against Plaintiff." Ching's concerns, the court said, "were genuine; he consulted with counsel and experts before taking action."[9] The upshot of the skirmishes in two courts was that each antagonist was cleared of the other's charges of misconduct, but the Trustees and the Attorney General were faulted for not being "diligent either with seeking instructions from the Court or promptly bringing their concerns to the attention of the Court."[10]

Stating "a genuine controversy continue[d] to exist among the Trustees . . . and there [were] matters yet to be settled," the court invoked "its equitable supervisory powers over Trusts" to direct

---

[8] Among the numerous specific "conclusions" supporting this ultimate conclusion were the following:

g. With their acquisition of Kawaiaha'o Plaza, the Trustees' principal was protected; there was a reasonable potential for capital appreciation; there was a fair opportunity for a reasonable return of income;

h. the law does not expect Trustees to be infallible in exercise of their discretion in matters relating to business;

i. under the circumstances, the purchase price of Kawaiaha'o Plaza was fair and reasonable;

j. although raising questions of appearances of impropriety, the Indemnification Agreement was proper under the circumstances;

k. transfer of Libby was necessary to get the creditors out of the project;

l. Plaintiff's business style differs substantially from that of Counter-Claimant; one is assertive and aggressive; the other is assertive and conservative. Neither style is preferable over the other; reasonable persons may differ in approach[.]

[9] Yet in the succeeding paragraph, its pronouncement was that "[n]either the preponderance of the proof nor the weight of the proof suggests that Plaintiff's Complaint or Counter-Claimant's Counter-Claim advance[d] the interests of the beneficiary or trust."

[10] The court awarded judgment to Ching on Takabuki's complaint and judgment to Takabuki on Ching's counterclaim. Each was ordered to bear his own attorney's fees and costs, as was the Attorney General. No reimbursement of fees and costs related to the state or federal suit was allowed for any of the parties.

"the Attorney General promptly to convey and transmit [its] Instructions to the Trustees ... ; and if necessary, [to] obtain compliance with [the] Instructions by appropriate legal action against all Trustees and KPA and its principals." The instructions emanating from the court included express commands to "enter into a proposed settlement with KPA and its principals under the settlement provisions of the Amended Purchase Agreement," seek "a formal opinion from the Internal Revenue Service to determine whether [the agreement] jeopardize[d] the charitable or tax-exempt status of the trust and beneficiary," and "restructure the acquisition in a manner that will not jeopardize the charitable status of the Estate and beneficiary."

Appeals by both Ching and Takabuki moved their battle to this court, and the major efforts here of both are centered on the circuit court's denial of attorneys' fees and costs for their efforts below.

## II.

We begin our analysis where the circuit court did by considering whether it had power to act on the matters presented for decision by Takabuki and Ching. We begin with this fundamental precept in mind — one who "is not before the court, . . . cannot be bound by the judgment rendered." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110 (1968); *see also Mallow v. Hinde,* 25 U.S. (12 Wheat.) 193, 198 (1827).[11] And when a perusal of the record confirms just who was before the court, we are driven to a conclusion that the court erred in answering the question posed at the threshold.

## A.

Invoking the jurisdiction vested in the circuit court by virtue of

---

[11] The pertinent statement of the Court in this early case was:

We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction. We put it on the ground that no Court can adjudicate directly upon a person's right, without the party being either actually or constructivelly [sic] before the Court.

Mallow v. Hinde, 25 U.S. (12 Wheat.) at 198.

HRS § 560:7-201(a)(3),[12] Takabuki brought suit against Ching and the Attorney General. His complaint, styled "A Bill for Instructions and Claim for Surcharge Against Hung Wo Ching," sought instructions from the court "that the investment in the Kawaiahao Plaza was within the discretion of the trustees" and "Defendant Ching's claims [were] unsound," as well as attorneys' fees and costs for the majority trustees and surcharges thereof against Ching.

That the Trustees of the Estate of Bernice Pauahi Bishop may seek instructions from the court, of course, is beyond cavil. *See e. g., Midkiff v. Kobayashi,* 54 Haw. 299, 302, 507 P.2d 724, 728 (1973); *Bishop v. Kemp,* 35 Haw. 1, 2 (1939).

> The trustees of a charitable trust, like the trustees of a private trust, can maintain a suit for instructions. The trustees are entitled to instructions as to the proper construction of the trust instrument, as to the validity of the trust, and as to the extent of their powers and duties. The purpose of the giving of instructions by the court is to enable the trustees properly to discharge their duties under the trust and to protect them in the discharge of these duties.

4 Scott, *The Law of Trusts* § 394 (3d ed. 1967) (footnotes omitted).

But it is settled too that "[t]he administration of charitable trusts is governed by majority rule." *Richards v. Midkiff,* 48 Haw. 32, 40, 396 P.2d 49, 55 (1964). "If there are several trustees . . . , the powers conferred upon them can properly be exercised by a majority . . . , unless it is otherwise provided by the terms of the trust." *Restatement (Second) of Trusts* § 383 (1957); *see also* 4 Scott, *supra* § 383. Here, the will of Princess Bernice Pauahi Bishop declared that "three of them at least must join in all acts."[13] Thus, "[t]he determination of whether the [Bishop Estate] should maintain a legal action require[d] the requisite concurrence of the trustees just as the exercise of any other power." *Richards v. Midkiff,* 48 Haw. at 41, 396 P.2d at 55.

---

[12] HRS § 560:7-201 vests "jurisdiction of proceedings initiated by trustees and interested persons concerning the internal affairs of trusts" in the circuit court. Section 560:7-201(a)(3) expressly empowers the court *to instruct trustees. See supra* note 6.

[13] *See supra* note 7.

Takabuki neither averred nor established "the requisite concurrence" in seeking review of trustee conduct relating to the acquisition of Kawaiaha'o Plaza and instructions from the circuit court. Nor does it appear anywhere in the record that at least three of the Trustees sought allowances of attorneys' fees and costs from the Estate and the assessment of surcharges for such allowances against Ching. Under the circumstances, there was no basis for the court to review the transaction upon Takabuki's solicitation, pass judgment thereon, and instruct the Trustees; for the Trustees were not before the court.

### B.

Ching likewise purported to act "in his capacity as a Trustee" when he filed a counterclaim against Takabuki "in his capacity as a Trustee." He asserted he had "both the standing and the duty to protect the interests of the present and future beneficiaries of the Estate from having the Estate's assets depleted and/or mismanaged." Any question about his standing to sue, he claimed, had been settled by our decision in *Richards v. Midkiff, supra.*

To be sure, "there is [a] principle of trust law which permits one trustee to bring an action against his co-trustee to compel the latter to perform his duties under the trust or to enjoin him from committing a breach of trust or to compel him to redress a breach of trust. Restatement (Second), *Trusts,* § 200, comment *e* (1959); 2 Scott, *Trusts,* § 200.2 (2d ed. 1956)." *Id.* at 42, 396 P.2d at 56. This is true also where charitable trusts are concerned. "It is clear . . . that where there [is a charitable trust with] several trustees, one of them may maintain an action against the others to enforce the trust or to compel the redress of a breach of trust." 4 Scott, *supra* § 391 (footnote omitted).

But Ching did not sue "the others"; he sued only one of them. And even when this was brought to the circuit court's attention by his opponent, he insisted "[i]t [was] not necessary for any other parties to be named for him to bring such a suit." *See* Memorandum In Opposition To Motion To Dismiss For Failure To Name Indispensable Parties at 2. Though Ching sought relief by way of surcharges against Takabuki, he prayed further that the circuit court "rescind and/or reform the Amended Kawaiahao Plaza Purchase

Agreement," find he "ha[d] satisfied his fiduciary duty," and "order and instruct the Trustees . . . to take appropriate action." Yet he failed to have "three of them at least" summoned to appear and respond to his counterclaim.

Granted, "[t]he rule regarding indispensable parties is founded on equitable considerations and is not jurisdictional." *Midkiff v. Kobayashi,* 54 Haw. at 324, 507 P.2d at 739 (citing 3A Moore, *Moore's Federal Practice* ¶ 19.19 (2d ed. 1967). Moreover, in *Midkiff v. Kobayashi* we said that where the "substantive issues [on appeal were] important," they would not "be sidestepped on technical considerations regarding indispensable parties." *Id.* Still, we were speaking there of third parties, privies to agreements made by the Trustees which were the subject of the litigation. We were not referring to the Trustees, or "three of them at least," whom the court was being importuned to advise and direct regarding their responsibilities.[14]

It was the better part of discretion for the court to have joined the rest of the Trustees as parties before proceeding to trial. Not having done so, the court ought not have "take[n] jurisdiction of a case where it [was] apparent on the record that [it could not] proceed to final judgment and execution." *Kaopua v. Keelikolani,* 6 Haw. 123, 124 (1874).

### III.

Ordinarily, we would bring our opinion to a close at this point; we would set aside the judgment and remand the case with an instruction to dismiss the action. In this case, however, what occurred in the circuit court calls for further comment.

The Trustees, the court found, have "discretionary authority to invest in commercial property provided that those investments are consistent with the provisions of the Will of Decedent, Bernice Pauahi Bishop, and conform with prudent fiduciary standards." It then concluded neither litigant breached his fiduciary duty in the

---

[14] In *Midkiff v. Kobayashi,* the plaintiffs were Frank E. Midkiff, Edwin P. Murray, Atherton Richards, Richard Lyman, Jr., and Herbert K. Keppeler. The defendant was Bert T. Kobayashi, Attorney General of the State of Hawaii. Thus, all five trustees joined in seeking instructions from the court.

exercise of this discretionary power. Yet it proceeded to issue instructions for the Trustees to follow.

"Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." *Restatement (Second) of Trusts* § 187 (1959); *see also Miller v. First Hawaiian Bank,* 61 Haw. 346, 351, 604 P.2d 39, 43 (1979) (citing § 187); *Dowsett v. Hawaiian Trust Co.,* 47 Haw. 577, 581, 393 P.2d 89, 93 (1964) (quoting § 187); In re *Estate of Campbell,* 42 Haw. 586, 603-04 (1958) (also quoting § 187). The rule is no different for charitable trusts. "Where discretion is conferred upon the trustees of a charitable trust, the court will not interfere with the exercise of their discretion, except to prevent an abuse of discretion." 4 Scott, *supra* § 382; *see also* In re *Estate of Bishop,* 53 Haw. 604, 607, 499 P.2d 670, 673 (1972). And the "fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee." *Restatement (Second) of Trusts* § 187 comment e (1959).

The decision, judgment, and order of the circuit court are vacated, and the case is remanded with instructions to dismiss the "Bill for Instructions and Claim for Surcharge Against Hung Wo Ching" and the "Counterclaim" with prejudice.

*Godfrey L. Munter, Jr.,* A Professional Law Corp., of counsel (*David F. Simons,* A Law Corp., of counsel, with him on the briefs) for defendant, counterclaimant-appellant, cross-appellee.

*Seth M. Hufstedler* (with him on the briefs: *Jerome H. Craig, Hufstedler, Miller, Carlson & Beardsley,* of counsel; and *James E. T. Koshiba; Koshiba & Young,* of counsel) for plaintiff, counterclaim defendant-appellee, cross-appellant, cross-appellee.

*Harold W. Nickelsen (Robert Bruce Graham, Jr.,* with him on the brief; *Hamilton, Gibson, Nickelsen, Rush & Moore,* of counsel) for Amicus Curiae Trustees of the Estate of Bernice Pauahi Bishop.