KAPIOLANI PARK PRESERVATION SOCIETY, a Hawaii non-profit corporation, Plaintiff-Appellant, *v.* CITY AND COUNTY OF HONOLULU, STATE OF HAWAII, PENTAGRAM CORPORATION, ROYAL CONTRACTING CO., LTD., Defendants-Appellees, and JOHN DOES 1-10, et al., Defendants

NO. 12323

(CIVIL NO. 87-0634)

MARCH 22, 1988

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from a summary judgment, certified under HRCP 54(b), in favor of defendants City and County of Honolulu (City), Pentagram Corporation (Pentagram) and the State of Hawaii (State), dismissing, as to said defendants, the first amended complaint filed by the plaintiff, which contained eight counts with respect to a proposed "concession" agreement between appellees City and Pentagram.

The proposed agreement provided, inter alia, that the City would turn over, at a rental proposed by Pentagram, for a period

of 15 years, a specific area of 10,000 feet adjacent to the Honolulu Zoo, and within the bounds of Kapiolani Park. Pentagram was to expend not less than $1,500,000 to erect a restaurant thereon; was to have the right to assign the agreement, with the consent of the City; to mortgage the same; was required to maintain and replace the improvements; and to conduct thereon a restaurant business under conditions as specified in the proposal. At the request of the City, the State Board of Land and Natural Resources approved the proposed agreement.

Appellant alleged that it is a Hawaii non-profit corporation whose members include persons who live adjacent to, and make frequent use of, Kapiolani Park.

The question adjudicated below, and appealed here, is whether the transaction in question was within the powers the City has been given over Kapiolani Park. Appellant's contention is that Kapiolani Park is the subject of a charitable trust, of which the appellee City stands in the position of a trustee; that the proposed transaction is a lease of a part of Kapiolani Park; and that the City, as trustee, does not have the power to grant such a lease. Thus, the claim is one of breach of trust.

It is well settled that the determination of whether or not a particular proposed action, by the trustee of a charitable trust, would constitute a breach of that trust, is a matter to be determined by the courts, as a part of their inherent jurisdiction. 15 Am.Jur.2d, *Charities* § 135 (1976); 14 C.J.S., *Charities* § 49 (1939). Ordinarily, such a question is raised when the trustee, or the attorney general acting in the capacity of parens patriae, files a petition seeking the instructions of the court or, in the cases where the trustees make periodic accounts of their stewardship to the court, such a question may be raised by a master appointed by the court to review the report.[1]

Here, the City had received, from plaintiff's attorney, a detailed letter setting out the basis of the claim that the transaction in question would be a breach of trust. It also had, in its files, a letter opinion from the corporation counsel dated August 14, 1969, that

---

[1] In the case of Kapiolani Park, the City files no accounts of its stewardship with the court.

the operation of a restaurant within Kapiolani Park, on an arrangement for a term of years, was not incidental to, and appropriate for, park use.[2] The City, nevertheless, chose not to seek instructions from the court, but to proceed with the proposed transaction.

The attorney general, despite having rendered a lengthy opinion, on December 10, 1986, to the chairperson of the Board of Land and Natural Resources, raising substantial doubts as to whether the transaction was consonant with the public purpose of the Park, nevertheless chose to support the City. Thus, the attorney general, as parens patriae, has abandoned the defense of the possible rights of the beneficiary of the trust, the public.

In view of the communications and legal opinions we have cited, we think that the corporation counsel for the City, and the attorney general as parens patriae, whatever their legal opinion as to the correct answer to the controversy, must have recognized that the law on the matter was, at least, subject to reasonable doubt, and each, therefore, should have brought the matter to the courts.

If Kapiolani Park is the subject of a charitable trust, then the City is the trustee by virtue of the executive order of the governor turning the property over to it. Where a trustee of a public charitable trust is a governmental agency, such as the City, and that agency does not file periodic accounts of its stewardship, and will not seek instructions of the court as to its duties, even though there is a genuine controversy as to its power to enter into a particular transaction, and where, in such a case, the attorney general as parens patriae, has actively joined in supporting the alleged breach of trust, the citizens of this State would be left without protection, or a remedy, unless we hold, as we do, that members of the public, as beneficiaries of the trust, have standing to bring the matter to the attention of the court.

Were we to hold otherwise, the City, with the concurrence of the attorney general, would be free to dispose, by lease or deed, of all, or parts of, the trust comprising Kapiolani Park, as it chose, without the citizens of the City and State having any recourse to the

---

[2] The letter opinion was part of a public controversy at the time and its contents were generally known in the community. Accordingly, under HRE 201(b)(1), (c) and (f), we take judicial notice of it.

courts. Such a result is contrary to all principles of equity and shocking to the conscience of the court.

To determine whether Kapiolani Park is subject to a trust and, if so, whether the proposed transaction would be a breach of that trust, we must look to the undisputed facts as to the origin of the Park.

In 1896, an understanding was reached between (1) the Kapiolani Park Association, which held a little over nine acres of land in fee, and a larger area on lease from the Republic, as a park, (2) William G. Irwin, who owned certain fee premises in the area, and (3) the Republic of Hawaii. The understanding was that (a) the Republic and Irwin would enter into an agreement whereby Irwin would convey certain of his fee lands, which were leased to the Park Association for park use, to the Republic, to be used permanently as a free public park, in exchange for certain other lands owned by the Republic, (b) the Park Association would turn over its leased and fee lands to the Republic, for the same use, and (c) the Republic, in turn, would deed the lands received from Irwin and the Park Association, and certain Crown lands then under lease, to six individuals as the Kapiolani Park Association, their heirs and successors-in-trust forever, for the maintenance of a free public park, with certain limitations upon the powers of the commission including an express provision that "[t]he said Commission shall not have authority to lease or sell the land comprising the said park or any part thereof[.]"

The agreement was set out in, and became law by, Act 53 of the Session Laws of 1896, approved the sixth day of June of that year.

On July 1, 1896, the Kapiolani Park Association, in furtherance of the agreement, surrendered its leasehold and deeded its fee land to the Republic of Hawaii in a deed containing recitals with respect to Act 53, and providing in the habendum clause: "[F]orever upon trust for the purpose declared in said Legislative Enactments". On that day, William G. Irwin and the Republic entered into exchange deeds, Irwin conveying his lands, as agreed, to the Republic with the same recitals and habendum. Still that same day, the Republic, by deed, conveyed the former Irwin, Park Association and Crown lands, then comprising Kapiolani Park (of which the parcel in question was a part), to the six individuals, who would comprise the

Commission, as provided by the Act, with appropriate recitals of the history of the understanding, under a habendum which provided: "[U]pon the trust to use and maintain the same as a public park and recreation ground, in compliance with the terms and provisions of and subject to the limitations and conditions imposed by Legislative Enactments."

Subsequently, in 1910, Irwin conveyed additional lands to the Commission upon the same trust and with the same powers and limitations.

Thus, it is clear and indisputable that, beginning with the deeds of July 1, 1896, Kapiolani Park was a public charitable trust, and the park commissioners were its trustees. With respect to their power to make leases, it has been said, "Whether the trustees may lease the property is primarily dependent on the terms of the instrument creating the trust." 14 C.J.S., *Charities* § 48 at p. 506 (1939). In this case, there can be no doubt. The trustees were expressly forbidden, by Act 53, and therefore by the deeds in question, to enter into leases or deeds of the trust lands, or any part thereof.[3]

So the situation stood when, in 1913, the territorial legislature passed Act 163 upon which the appellees rely.

Act 163 was entitled "To Transfer The Control And Management Of Kapiolani Park From The Honolulu Park Commission To The City And County Of Honolulu, And To Repeal Certain Laws Relating To Said Park." Two of the introductory clauses to the statutes stated:

> WHEREAS, by various deeds, conveyances and bills of sale, the said Honolulu Park Commission has acquired and now holds the real and personal property, comprising the Kapiolani Park, in trust, to use and maintain the same as a free public park and recreation ground, in compliance with the terms and provisions of and subject to the limitations and conditions imposed by legislative enactment; and

---

[3] Appellees argue that the power to alienate the trust lands, forbidden by the instruments creating the trust, is merely incidental to, and not a part of the essential terms of the trust. Such has never been the law of trusts or conveyancing. The fact that the power of alienation is restricted is one of the characteristics which distinguishes trust estates from those held free of trust.

WHEREAS, by various statutes passed by the Legislature of the Territory, the care, custody, maintenance and control of all public parks in the Territory of Hawaii, except the said Kapiolani Park and the Makiki Park or Reservation, have been transferred to and placed in charge of the Board of Supervisors of the several political subdivisions of the Territory[.]

The Act further directed the Honolulu Park Commission to forthwith convey to the Territory all of the property comprising the Park, authorized the governor to set aside, by executive order, to the City and County of Honolulu, the property comprising the Park, and repealed the provisions of Act 53, which had been, by then, incorporated into the Revised Laws of Hawaii 1905, as sections 765 to 770.

Appellees contend that by virtue of the repeal of section 6 of Act 53 of the Laws of 1896 (section 769, Revised Laws of Hawaii 1905, which was the section prohibiting leases or deeds of park lands), the City was no longer restricted by the prohibition contained therein, and has the power to lease and sell all, or portions, of the land of Kapiolani Park. They rely on the provisions of HRS § 171-11 as giving the City such power, restricted only by the provision that it be consistent with the terms upon which the land was set aside for public use.[4]

If Act 163 of the Session Laws of 1913 had the effect of granting to the City a power to lease, in derogation of the express terms of the trust as it was created, it would have been beyond the legislature's power and unconstitutional. The power of the legislature of the Territory of Hawaii was based upon section 55 of the Organic Act (Act of April 30, 1900, c 339, 31 Stat. 141), which gave to it the power to legislate, with respect to all rightful subjects of legislation, not inconsistent with the constitution, and laws of the United States locally applicable. Under Article I, Section 10 of the Constitution of the United States, the states were forbidden to enact laws impairing

---

[4] Although the corporation counsel's opinion of August 14, 1969 and the attorney general's opinion of December 10, 1986 conclude that a restaurant (the proposed use under the City-Pentagram agreement), in and of itself, is not consistent with park use, we do not here reach that question.

the obligation of contracts. It is difficult to imagine that Congress, in enacting the Organic Act, intended to give the legislature of the Territory a power which the Constitution forbad the states, and indeed, it always seems to have been accepted that the limitation on the impairment of contracts extended to the legislature of the Territory of Hawaii. *See Territory v. McVeagh,* 23 Haw. 176, 178 (1916).

The parties, in their briefs, did not cite to us the most famous case in American judicial history, with respect to charitable trusts, a case which happens to be in point on this issue. The *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L.Ed. 629 (1819). That case was argued, for the appellant, by the great Daniel Webster, and opinions were rendered, by, among others, the famous Justices Marshall and Story. Daniel Webster, in his address to the Court, and Chief Justice Marshall, in his opinion, pointed to the history of charitable trusts before the American Revolution, and noted that the terms of a charitable trust, the res of which was vested in trustees, were binding on the Crown, so that an essential change therein, by the King, would have been extraordinary and unprecedented.

In the *Dartmouth College* case, the legislature of the State of New Hampshire had, by statute, sought to take the res of the trust from the trustees of Dartmouth College, and turn the same over to a new board of trustees, as the board of "Dartmouth University". Such action clearly was an alteration of the trust created by the donations of the Reverend Eleazar Wheelock and others under the charter granted by King George III, in 1769.

In that case, as here, it was argued that the legislature had the power to alter the trust, especially since lands had been added to the trust by the States of New Hampshire and Vermont, and that, after all, the change really was for the benefit of, and would result in the expansion of, the trust.

As Chief Justice Marshall pointed out, after painstaking analysis, the charter created a contract, the obligations of that contract could not be impaired by the legislature of New Hampshire, and the legislative changes, altering the terms of the trust, were an impairment of it. With respect to the changes made by the legislature in that case, he said:

This may be for the advantage of this college in particular, and

may be for the advantage of literature in general, but it is not according to the will of the donors, and is subversive of that contract, on the faith of which their property was given.

4 L.Ed. 629 at 651.

The power, which the appellees, in this case, claim the City, as trustee, was given by Act 163 of the Session Laws of 1913, to dispose of all or portions of Kapiolani Park by lease or deed, a power expressly forbidden the trustees at the inception of the trust, is just such an alteration of the terms of the trust as was being considered in the *Dartmouth College* case, and the other cases cited by Daniel Webster and by the justices in the printed reports of that case. As the Supreme Judicial Court of Massachusetts said in a similar situation, *In re Opinion of the Justices,* 237 Mass. 613, 617, 131 N.E. 31, 32 (1921):

Several of the bills seemingly purport to authorize changes in the terms upon which property devoted to charitable uses is to be held and enjoyed. . . .

. . . .

Gifts to trustees or to eleemosynary corporations, accepted by them to be held upon trusts expressed in writing or necessarily implied from the nature of the transaction, constitute obligations which ought to be enforced and held sacred under the Constitution. It is not within the power of the Legislature to terminate a charitable trust, to change its administration on grounds of expediency, or to seek to control its disposition under the doctrine of cy pres.

If Act 163 of the Session Laws of 1913 had the purpose, and intent, argued for by the appellees, it would have been beyond the power of the Territorial legislature, because it impaired the obligations of the contract under which the trust was created, contrary to Article I, Section 10 of the Constitution of the United States.

Even more fundamentally, it should have been beyond the legislature's power because it would have violated the basic principles of equity. The government agreed with the other donors to create a trust subject to certain restrictions, which included a prohibition on leases. It obtained the deeds of portions of the Park only by making

such an agreement. We cannot believe that, as appellees argue, the legislature intended, in effect, to defraud the donors, by giving the trustee City a power which the government had expressly agreed the trustee would not have.

Legislative acts, however, are not to be held invalid, or unconstitutional, or unconscionable, if such a construction can reasonably be avoided, and here it can. It is obvious that the intent of the legislature in enacting Act 163 was to transfer Kapiolani Park to the City as trustee to be held in conformance to the terms of the trust. It is equally obvious that the then trustees acquiesced in such a transfer. Had they resisted such a transfer in 1913, a different question would have been presented.

But there is nothing in the record to indicate an intention, on the part of the legislature, to do that which it could not legally, and in good conscience, do; that is, to confer upon the City a power to part, through deed or lease, with all, or portions, of Kapiolani Park. Accordingly, we reject appellees' argument that Act 163 of the Session Laws of Hawaii 1913 gave to the City the power to lease, or deed away, all, or portions, of Kapiolani Park, which had been expressly forbidden in the trust instruments to its predecessor trustees. We hold that that Act did not give the City, as trustee, the power to lease or deed all, or portions of the Park, which appellees claim the City has.

Since the leasing of lands of the Park is not consistent with the original trust documents, it follows that HRS § 171-11 does not, and could not, confer upon the City power to make leases or deeds of a part or all of the lands of Kapiolani Park.

We turn then to the question of whether the proposed transaction between the City and Pentagram is a lease. Appellees have chosen to denominate it a "concession". Their denomination or characterization of the transaction, however, is not binding, for as appellant correctly notes, quoting the bard,

What's in a name? that which we call a rose
By any other name would smell as sweet[.]

Shakespeare, *Romeo and Juliet,* II, ii.

There is a plethora of decided cases distinguishing between leases, which convey an interest in the land, and mere licenses, of which concessions are an example. As we have pointed out, here we

have a transfer of possession for a *fixed term* of 15 years of a *definite parcel* of real estate. The interest granted is *not terminable* at will. It is, however, *assignable,* with the consent of the transferor, the trustee. It is *mortgageable.* The improvements are to be *constructed, maintained* and, in the event of destruction, *replaced* by the transferee. In the event of default, *rights* are given to any mortgagee. There are even provisions concerning *apportionment of proceeds* on condemnation. The agreement generally has all of those provisions normally found in commercial leases.

Two Hawaii cases, which address the distinction between leases, and licenses, are *McCandless v. John Ii Estate, Limited,* 11 Haw. 777 (1899), and *In re Fasi,* 63 Haw. 624, 634 P.2d 98 (1981). Measured by the criteria laid down in those cases, the agreement challenged here clearly calls for an instrument transferring an interest in the land. As this court said, long ago, but almost contemporaneously with the creation of the Kapiolani Park trust, in *McCandless v. John Ii Estate:*

A "license" in the law of real property is an "authority to do a particular act or series of acts upon another's land without possessing any estate therein." [Citation omitted.] It is a personal privilege, is not assignable, ceases upon the death of either party and is revoked by a sale of the land by the licensor. But the agreement expressly binds the executors, administrators and *assigns* of the parties. . . . If the instrument in question passes to the plaintiff a right to use the land for a definite term for a specific purpose, . . . it creates an "interest" in the land, and therefore it does not create a license revocable at the will of the licensor[.]

11 Haw. at 788-89 (emphasis in original).

The proposed concession agreement has all of the indicia of a lease, and none of a license. It is legally, despite the name given to it by the appellees, what common sense tells us it clearly is, *i.e.* a lease. The agreement therefore is a breach of trust on the part of the City and beyond the powers of the City as trustee. The judgment below is reversed and the case is remanded for further proceedings consistent herewith.

580

 

*Carroll S. Taylor (Kimo C. Leong* and *Gregory W.K. Chee* with him on the briefs; *Taylor & Leong)* for appellant.

*Maria C. Avinante-Tanaka,* Deputy Corporation Counsel, for appellee City.

*Thomas M. Culbertson (Paul Alston* with him on the brief; *Paul, Johnson & Alston* of counsel) for appellee Pentagram.

*Randall Y.K. Young,* Deputy Attorney General, for appellee State.

## CONCURRING OPINION OF NAKAMURA, J.

The court rules the plaintiff-appellant has standing to challenge the action of the trustee because (1) the trustee is a government agency that does not file periodic accounts of its stewardship and will not seek instructions of the court despite the existence of a genuine controversy regarding its power to lease trust lands, (2) the attorney general has actively joined in supporting the alleged breach of trust, and (3) the citizens would be left without protection or a remedy if the suit were not allowed. It then holds the trust documents expressly forbid the leasing of the trust lands.

I join in the court's judgment on this understanding of the scope of the opinion and on the further understanding that the standing requirements for breach of trust suits have not been amended in any other way. I also do not read the opinion as altering the general rule that " '[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.' *Restatement (Second) of Trusts* § 187 (1959); *see also Miller v. First Hawaiian Bank,* 61 Haw. 346, 351, 604 P.2d 39, 43 (1979) (citing § 187); *Dowsett v. Hawaiian Trust Co.,* 47 Haw. 577, 581, 393 P.2d 89, 93 (1964) (quoting § 187); In re *Estate of Campbell,* 42 Haw. 586, 603-04 (1958) (also quoting § 187)." *Takabuki v. Ching,* 67 Haw. 515, 530, 695 P.2d 319, 328 (1985) (quoting *Restatement, supra).*