PELE DEFENSE FUND, Plaintiff–Appellant, v. WILLIAM PATY, in his capacity as Chairperson of the Board of Land and Natural Resources, State of Hawaii, MOSES KEALOHA, DOUGLAS ING, LEONARD ZALOPANY, JOHN ARISUMI and HERBERT ARATA, in their capacity as members of the Board of Land and Natural Resources, THE ESTATE OF JAMES CAMPBELL, Deceased, FRED E. TROTTER, W.H. McVAY, P.R. CASSIDY, and HERBERT C. CORNUELLE, in their fiduciary capacity as Trustees under the Will of James Campbell, Deceased, TRUE ENERGY GEOTHERMAL CORP., TRUE GEOTHERMAL DRILLING CO., and MID–PACIFIC GEOTHERMAL, INC., Defendants–Appellees

No. 15373

(CIV. NO. 89–089)

SEPTEMBER 28, 1992

LUM, C.J., WAKATSUKI,* MOON, KLEIN, AND LEVINSON, JJ.

---

*Associate Justice Wakatsuki, who heard oral argument, passed away on September 22, 1992. *See* HRS § 602–10 (1985).

580

582

584

OPINION OF THE COURT BY KLEIN, J.

In December, 1985, the State of Hawaii (the State) exchanged approximately 27,800 acres of public "ceded" lands, including the Wao Kele 'O Puna Natural Area Reserve and other Puna lands on the Island of Hawaii, for approximately 25,800 acres of land owned by the Estate of James Campbell, Deceased, (Campbell Estate or Campbell) at Kahauale'a. Plaintiff–Appellant Pele Defense Fund (PDF) primarily argues that the exchange constitutes a breach of the trust created under § 5(f) of the Hawaii Admission Act and article XII, § 4 of the Hawaii Constitution. The § 5(f) claim is brought under 42 U.S.C. § 1983 (section 1983 or § 1983). PDF also alleges that: the exchange violates article XII, § 7 of the Hawaii Constitution, Hawaii Revised Statutes (HRS) chapters 171 and 195, and the constitutional right to due process; and that defendants–appellees Campbell, True Energy Geothermal Corp., True Geothermal Drilling Co., and Mid–Pacific Geothermal Inc.'s[1] exclusion of PDF members from the exchanged lands

---

[1] True Energy Geothermal Corp., True Geothermal Drilling Co., and Mid–Pacific Geothermal Inc. will be referred to, collectively, as True or the True defendants.

violates their rights under article XII, § 7. PDF's prayer for relief seeks a declaration that the exchange was a breach of trust and a violation of law and requests a return of the exchanged lands to ceded land status via a constructive trust or another land exchange.

These issues are presented to us on appeal from the Third Circuit Court's Findings of Fact, Conclusions of Law and Decision and Order Granting Defendants' Motions to Dismiss or, Alternatively, for Partial Summary Judgment (Order Granting Summary Judgment). We affirm in part and reverse in part and remand on the limited question of whether Campbell and True should be enjoined from disallowing PDF's native Hawaiian members access into undeveloped areas of Wao Kele 'O Puna for traditional subsistence, cultural, and religious purposes.

## FACTS

Hawaii's ceded lands are lands which were classified as government or crown lands prior to the overthrow of the Hawaiian monarchy in 1893. Upon annexation in 1898, the Republic of Hawaii ceded these lands to the United States. In 1959, when Hawaii was admitted into the Union, the ceded lands were transferred to the newly created state, subject to the trust provisions set forth in § 5(f) of the Admission Act. Hawaii Admission Act, Pub. L. No. 86–3, 73 Stat. 4, 6 (1959). Section 5(f) provides:

> The lands granted to the State of Hawaii by subsection (b) of this section . . . together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust
> [1]  for the support of the public schools and other public educational institutions,
> [2]  for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended,

[3] for the development of farm and home ownership on as widespread a basis as possible,

[4] for the making of public improvements, and

[5] for the provision of lands for public use.

Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State shall provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.

73 Stat. at 6.

The public lands trust is also recognized in the Hawaii Constitution. Article XII, § 4 declares:

The lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public.

Haw. Const. art. XII, § 4.[2] The Department of Land and Natural Resources (DLNR), headed by an executive board known as the Board of Land and Natural Resources (BLNR), is the agency

---

[2] In article XVI, § 7, referred to by article XII, § 4, the State affirmatively assumes the § 5(f) trust responsibilities:

Any trust provisions which the Congress shall impose, upon the admission of this State, in respect of the lands patented to the State by the United States or the proceeds and income therefrom, shall be complied with by appropriate legislation. Such legislation shall not diminish or limit the benefits of native Hawaiians under Section 4 of Article XII.

Haw. Const. art. XVI, § 7 (1959, amended 1978). The "available lands" specifically excluded by article XII, § 4 are also held in trust by the State as the Hawaiian Home Lands Trust. *See* Haw. Const. art. XII, §§ 1–3 (1959, amended 1978). This suit raises no issues pertaining to the Hawaiian Home Lands Trust.

charged with the administration of public lands, including those subject to the § 5(f) trust. HRS § 171-3 (Supp. 1991). HRS chapter 171 governs the management and disposition of public lands in general. HRS chapter 195 establishes that certain lands, endowed with "unique natural resources," should be preserved "in perpetuity" in a statewide Natural Area Reserves System (NARS). HRS § 195-1 (1985). In 1987, chapter 195 was amended to allow alienation of NARS land for "another public use upon a finding by the [DLNR] of an imperative and unavoidable public necessity." HRS § 195-10 (Supp. 1991). Within this legal framework, we review the contested land exchange.

On December 23, 1985, the State and Campbell exchanged deeds, the State receiving Campbell's Kahauale'a land and Campbell receiving Puna lands including the Wao Kele 'O Puna NARS land, the Puna Forest Reserve and other state lands. The exchange followed a series of studies and hearings and the designation of a portion of the Kilauea Middle East Rift Zone (KMERZ), located primarily within Wao Kele 'O Puna, as a geothermal resource subzone. The designation of the geothermal resource subzone and the granting of a geothermal development permit were previously reviewed and upheld by this court on appeal from the BLNR's decisions. *See Dedman v. Board of Land & Natural Resources*, 69 Haw. 255, 740 P.2d 28 (1987), *cert. denied*, 485 U.S. 1020 (1988).[3]

In January 1986, pursuant to HRS § 171-50(c), the BLNR submitted the land exchange to both the senate and the house of representatives of the Hawaii Legislature for review.[4] The

---

[3] Our opinion in *Dedman* contains a detailed recitation of the events leading up to the geothermal resource subzone designation and the land exchange. *Dedman*, 69 Haw. at 257-58, 740 P.2d at 30-31.

[4] HRS § 171-50(c) (1985) provides in relevant part:

Any exchange of public land for private land shall be subject to disapproval by the legislature by two-thirds vote of either the senate or the house of rep-

exchange became effective when the Legislature failed to disapprove it by April 23, 1986, the last day of the 1986 legislative session. Nearly a year later, Executive Order No. 3103, designating Wao Kele 'O Puna as NARS land, was canceled by Executive Order No. 3359, and Wao Kele 'O Puna was transferred out of the NARS.

PDF and Kaolelo Lambert John Ulaleo (Ulaleo) filed a lawsuit against the BLNR members in their official capacities, on April 25, 1988, in the United States District Court for the District of Hawaii. *See Ulaleo v. Paty*, 902 F.2d 1395, 1397 (9th Cir. 1990). Ulaleo and PDF brought suit under § 1983, seeking to invalidate the exchange based on alleged violations of the § 5(f) trust provisions and the due process clause of the fourteenth amendment. *Id.* The federal complaint also alleged violations of state law and the state constitution. *Id.* Upon defendants' motion, the district court dismissed all claims. *Id.* at 1396.

During the pendency of the appeal to the Ninth Circuit Court of Appeals, Ulaleo died; PDF continued the appeal as the sole plaintiff. *Id.* at 1397. The Ninth Circuit affirmed the dismissal of the § 1983 claims, holding that suit was barred by the eleventh amendment because PDF was, in fact, seeking retrospective relief. *Id.* at 1398–1400. PDF's pendent state law claims were also barred because, after the federal claims were dismissed, the justification for adjudicating them in federal court no longer existed. *Id.* at 1400. The court noted that, "[t]he claims could be brought very appropriately in the state court, or given the nature of the dispute and the statutory language, before even the state legislature." *Id.*

PDF filed the complaint in this action on March 10, 1989, while the federal suit was still pending. After Ulaleo's death in early 1990, Emily 'Iwalani Naeole (Naeole) moved to intervene as a plaintiff, pursuant to Hawaii Rules of Civil Procedure (HRCP)

---

resentatives or by majority vote of both in any regular or special session next following the date of the exchange.

24(a). Naeole claimed an interest, as a native Hawaiian and a resident of the ahupua'a [5] adjacent to Wao Kele 'O Puna, in the subject matter of the action, such that disposition of the action would, as a practical matter, impair or impede her interest, and that no other party adequately represented that interest. The circuit court denied Naeole's motion, finding that her "interests are adequately represented by Plaintiff Pele Defense Fund which remains as an existing party." [6]

On December 13, 1990, several months after the Ninth Circuit decision was announced, PDF filed an amended complaint, adding Campbell and True as defendants and modifying its prayer for relief to eliminate the request to declare the exchange a nullity. We summarize PDF's claims for relief as follows:

1.  Breach of trust under (a) § 5(f) of the Admission Act, in violation of § 1983, and (b) article XII, § 4 of the Hawaii Constitution;

2.  Violation of due process under (a) the fourteenth amendment of the U.S. Constitution, contrary to § 1983, and (b) article I, § 5 of the Hawaii Constitution;

3.  Violation of the right to free association under the first amendment to the United States Constitution and article I, § 4 of the Hawaii Constitution;

4.  Violation of article XII, § 7 by (a) the relinquishment of state lands on which native Hawaiians customarily and traditionally exercised subsistence, cultural and religious practices and (b) the continued denial of access into Wao Kele 'O Puna to native Hawaiian PDF members who seek access for cus-

---

[5] An ahupua'a in ancient Hawaii was a division of land which usually ran from the sea to the mountains. *See generally Palama v. Sheehan*, 50 Haw. 298, 440 P.2d 95 (1968).

[6] Ironically, only a few months later, the same court found that Pele Defense Fund did not have standing to litigate claims on behalf of native Hawaiians such as Ms. Naeole in its Order Granting Summary Judgment.

tomarily and traditionally exercised subsistence, cultural and religious practices;

5. Violation of HRS §§ 171–26 and 171–50;

6. Violation of HRS chapter 195; and

7. Based on the foregoing violations, Campbell and True hold the exchanged lands subject to a constructive trust for the beneficiaries of the public lands trust.

The defendants raised a multitude of defenses, the most salient of which form the basis for the Order Granting Summary Judgment, including: sovereign immunity, statute of limitations, lack of standing, no private right of action, *res judicata*, collateral estoppel, failure to state a claim for which relief can be granted, and absence of indispensable parties. The circuit court concluded, in its forty–one page order, that there are "no material issues of relevant fact" between PDF and the defendants and dismissed the action in its entirety.

## DISCUSSION

### I. Section 1983 Claims

PDF argues that state officials who violate § 5(f) of the Admission Act may be sued in their official capacities for declaratory and injunctive relief under § 1983. The circuit court dismissed PDF's § 1983 claims on the basis of sovereign immunity, PDF's lack of standing, the statute of limitations, and the *res judicata* effect of *Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990). We acknowledge that sovereign immunity would not bar a § 1983 action brought against state officials in their official capacities prospectively to enjoin an alleged violation of § 5(f), and we find that PDF has standing to pursue such a claim. However, we also conclude that, in this case, PDF's § 1983 claims are barred by the statute of limitations and *res judicata*.

## A. Right to Sue

The Ninth Circuit Court of Appeals has long recognized that a claim may be brought pursuant to § 1983 to enforce federal rights created by § 5(f) of the Admission Act.[7] *See Price v. Akaka*, 928 F.2d 824 (9th Cir. 1990), *cert. denied*, 112 S. Ct. 436 (1991), *superseding* 915 F.2d 469 (9th Cir. 1990); *Ulaleo*, 902 F.2d at 1397; *Price v. State*, 764 F.2d 623 (9th Cir. 1985), *cert. denied*, 474 U.S. 1055 (1986); *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n (Keaukaha II)*, 739 F.2d 1467 (9th Cir. 1984). The Ninth Circuit had previously ruled that the Admission Act itself did not create an implied right of action under which a party could enforce the duties and obligations created by the Act in federal court. *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n (Keaukaha I)*, 588 F.2d 1216 (9th Cir. 1978), *cert. denied*, 444 U.S. 826 (1979). One of the bases for the court's ruling was that it saw "no federal purpose to be served by reading a private cause of action into the Admission Act." *Id.* at 1224. The court found the action to be "a matter of state concern" and held it would be "most appropriate for Hawaii's laws and judicial system to deal with it." *Id.* We will, in this case, clarify the role of Hawaii's courts in enforcing the terms of the public lands trust.

## B. Standing

PDF asserts that it has standing to challenge the disposition of § 5(f) lands because its members have suffered an "injury in fact"

---

[7] Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1988).

as a result of actions taken by state officials. The Ninth Circuit agreed in *Ulaleo,* finding that PDF had standing to sue to enforce the terms of the § 5(f) trust. 902 F.2d at 1397.[8]

We hold that PDF has standing to bring its claims in Hawaii courts, consistent with this court's decisions lowering standing barriers in cases of public interest. *See, e.g., In re Banning,* 73 Haw. 297, 313, 832 P.2d 724, 732–33 (1992); *Akau v. Olohana Corp.,* 65 Haw. 383, 652 P.2d 1130 (1982); *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 623 P.2d 431 (1981); *In re Application of Hawaiian Elec. Co.,* 56 Haw. 260, 535 P.2d 1102 (1975). Regardless of the standing theory, "the crucial inquiry . . . is 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of . . . [the court's] jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989) (citations

---

[8] The Ninth Circuit has consistently held that native Hawaiians and native Hawaiian groups have standing to bring claims to enforce the trust provisions of the Admission Act. In *Price v. State,* 939 F.2d 702 (9th Cir. 1991), *cert. denied,* 112 S. Ct. 1479, and *cert. denied,* 112 S. Ct. 1480 (1992), citing its earlier opinions, the court held that "persons in the position of these appellants do have standing to challenge the use of section 5(f) lands." *Id.* at 706 (citations omitted).

In the 1990 case brought by Price on behalf of the Hou Hawaiians, the Ninth Circuit held that Price, a native Hawaiian, had made allegations "sufficient to show an 'injury in fact'" even though legitimate § 5(f) uses might not necessarily benefit native Hawaiians. *Price v. Akaka,* 928 F.2d 824, 826 (9th Cir. 1990), *cert. denied,* 112 S. Ct. 436 (1991) (citations omitted), *superseding* 915 F.2d 469 (9th Cir. 1990). The court continued: "In addition, allowing Price to enforce § 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends on the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." *Id.* at 826–27 (citations omitted). In a footnote, the court rejected the OHA trustees' argument that the 1985 *Price v. State* standing ruling should not apply because Price was now seeking retrospective relief. *Id.* note 2. The court found that its standing decision applied to past and future alleged § 5(f) violations. *Id.; see also Price v. State,* 764 F.2d 623 (9th Cir. 1985), *cert. denied,* 474 U.S. 1055 (1986), and *Keaukaha II,* 739 F.2d 1467 (9th Cir. 1984).

omitted). This court has adopted a broad view of what constitutes a "personal stake" in cases in which the rights of the public might otherwise be denied hearing in a judicial forum. *Id.* at 283, 768 P.2d at 1299; *see also Akau*, 65 Haw. at 387–88, 652 P.2d at 1134.

In *Akau*, we held "that a member of the public has standing to sue to enforce the rights of the public generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." 65 Haw. at 388–89, 652 P.2d at 1134 (cited in *Hawaii's Thousand Friends*, 70 Haw. at 283, 768 P.2d at 1299). A plaintiff has suffered injury in fact when (1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for plaintiff's injury. *Akau*, 65 Haw. at 389, 652 P.2d at 1134–35 (citations omitted); *see also Hawaii's Thousand Friends*, 70 Haw. at 283, 768 P.2d at 1299.

The State argues that our holding in *Hawaii's Thousand Friends* requires a finding that PDF has suffered no injury in fact. We disagree. In that case, we held that Hawaii's Thousand Friends (HTF) lacked standing to bring claims on behalf of its members who were allegedly misled by advertisements run by the defendants. 70 Haw. at 284, 768 P.2d at 1300. We found that the injury arising out of the misrepresentation was a personalized injury, not suffered by the group in general. *Id.* Each HTF member would have relied differently on the alleged misrepresentation and would have suffered different injuries, necessitating different remedies. *Id.* at 284–85, 768 P.2d at 1300.[9]

---

[9] HTF's other claims were also dismissed for lack of standing because HTF suffered no injury in fact under *Akau*. HTF alleged that the illegal use of public money depleted funds that could be used for other programs and that HTF had to expend its own funds to investigate defendants' illegal conduct. *Hawaii's Thousand Friends*, 70 Haw. at 283–84, 768 P.2d at 1299. We found that these claims lacked allegations of concrete injuries and HTF was merely asserting a value pref-

In this case, the alleged § 5(f) violations are "generalized" injuries for which relief granted to the organization would provide a remedy to any individual member. In other words, if a court were to grant PDF an injunction remedying the State's breach of its trust obligations, PDF members and other trust beneficiaries would benefit indistinguishably. Furthermore, applying the three-pronged "injury in fact" test, we conclude that PDF has adequately alleged that: (1) its members are beneficiaries of the public trust who have been economically and/or aesthetically injured by a transfer of trust lands in contravention of trust terms; (2) its injuries are traceable to the alleged breach of trust; and (3) the requested relief would be likely to remedy the injuries by giving beneficial use of the exchanged land to trust beneficiaries. Thus, we conclude that PDF has alleged facts sufficient to show that it has suffered injury in fact.

In addition to injury in fact, *Akau* requires a showing that "the concerns of a multiplicity of suits are satisfied" by allowing a plaintiff to sue to enforce the rights of the public. *Akau*, 65 Haw. at 388–89, 652 P.2d at 1134. Although this case is not a class action suit like *Akau*, a multiplicity of suits may be avoided by allowing PDF to sue to enforce the State's compliance with the § 5(f) trust provisions, because granting a remedy to PDF would also provide relief to its members and other trust beneficiaries. Additionally, unless members of the public and native Hawaiians, as beneficiaries of the trust, have standing, the State would be free to dispose of the trust res without the citizens of the State having any recourse. *See Kapiolani Park Preservation Soc'y v. City & County of Honolulu*, 69 Haw. 569, 572, 751 P.2d 1022, 1025 (1988) (The court held that Kapiolani Park Preservation Society, a non-profit corporation whose members included neighbors and users of the

erence and not judicially cognizable claims. *Id.* In contrast, PDF alleges the breach of trust responsibilities which are codified in federal and state law and incorporated into the Hawaii Constitution.

park, had standing to bring breach of trust claims under the circumstances of that case; we stated that "the citizens of this State would be left without protection, or a remedy, unless we hold, as we do, that members of the public, as beneficiaries of the trust, have standing to bring the matter to the attention of the court.")

### C. Statute of Limitations

PDF disputes the circuit court's conclusion that this suit was not timely under the statute of limitations applicable to § 1983 actions. The critical inquiry, i.e., which Hawaii statute applies to § 1983 actions, is a matter of first impression.[10] We hold that the two–year statute of limitations set forth in HRS § 657–7 governs § 1983 actions,[11] rather than the six–year statute of limitations set forth in HRS § 657–1(4).[12]

Federal law dictates the characterization of claims brought under § 1983. *Wilson v. Garcia*, 471 U.S. 261, 268 (1985). How-

---

[10] Although not squarely before the court, the Circuit Court of Appeals for the Ninth Circuit cited HRS § 657–7 as the applicable statute of limitations in *Price v. State*, 939 F.2d 702 (9th Cir. 1991), *cert. denied*, 112 S. Ct. 1479, and *cert. denied*, 112 S. Ct. 1480 (1992). In a footnote, the Ninth Circuit indicated (in dictum) that HRS § 657–7 would apply to § 1983 actions in Hawaii:

> At any rate, if the seeking of state court approval were the wrong in question, that occurred in 1969 and the statute of limitations has long since run. Haw. Rev. L. [sic] § 657–7. *Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989).

*Id.* at 708 note 7.

[11] HRS § 657–7 (1985) provides in relevant part:

> Actions for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after . . . .

[12] HRS § 657–1 (1985) provides in relevant part:

> The following actions shall be commenced within six years next after the cause of action accrued, and not after:
> . . . .
> (4) Personal actions of any nature whatsoever not specifically covered by the laws of the State.

ever, the applicable statute of limitations is a matter of state law. *Id.* at 269. In *Wilson*, the United States Supreme Court decided that a single, most appropriate statute of limitations for all § 1983 claims should be selected in each state. *Id.* at 275. This conclusion was based on the "federal interests in uniformity, certainty, and minimization of unnecessary litigation." *Id.* The Court held that "§ 1983 claims are best characterized as personal injury actions." *Id.* at 280.

In *Owens v. Okure*, 488 U.S. 235 (1989), the Court reaffirmed that "a State's personal injury statute of limitations should be applied to all § 1983 claims." *Id.* at 240–41 (citing *Wilson*, 471 U.S. at 280). The Court again explained that it had, in *Wilson*, departed from its earlier rulings which had urged courts to pick the "most analogous" and "most appropriate" statute of limitations for the particular § 1983 claims. *Id.* at 239. The Court noted that the "most analogous" method "bred confusion and inconsistency . . . and generated time–consuming litigation." *Id.* at 240.

*Owens* also resolved the question of which statute of limitations applies to § 1983 claims where a state has more than one statute of limitations for personal injury actions. *Id.* at 236. The Court held that the "residual or general personal injury statute of limitations applies." *Id.* In this case, PDF argues that Hawaii's "residual" statute of limitations in HRS § 657-1(4) applies, rather than the residual *personal injury* statute of limitations appearing in HRS § 657-7. However, *Owens* and two subsequent Ninth Circuit cases counsel us to reject this argument.

When discussing the "residual or general" personal injury statute of limitations, the *Owens* Court was comparing general *personal injury* provisions with provisions that govern specific *personal injury* claims, such as statutes that cover particular intentional torts. *See, e.g.,* HRS § 657-4 (1985) (governing libel and slander); HRS § 657-7.3 (1985 & Supp. 1991) (governing medical torts); *see also Owens*, 488 U.S. at 241, 243–48. The Ninth Circuit

further clarified that when a state has a general personal injury statute of limitations, an even broader "catchall" statute of limitations like HRS § 657–1 need not be considered. *See Del Percio v. Thornsley*, 877 F.2d 785, 786 (9th Cir. 1989) (California's general personal injury statute applies to § 1983 actions, rather than its "catchall" statute of limitations); *Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir.), *cert. denied*, 493 U.S. 860 (1989) (Nevada's general personal injury statute of limitations applies to § 1983 actions and thus the residual statute of limitations need not be considered).[13]

In Hawaii, HRS § 657–7 is the "general" *personal injury* statute of limitations. This statute applies to "[a]ctions for the recovery of compensation for damage or *injury to persons* or property" and is distinguished from specific personal injury statutes like HRS §§ 657–4 and 657–7.3. We agree with the Ninth Circuit's interpretation of *Wilson* and *Owens* and conclude that the United States Supreme Court intended that a state's "catchall" provision would apply only if there were no general personal injury statute. *See, e.g., Del Percio*, 877 F.2d at 786.[14] Thus, the two–year limita-

---

[13] In *Perez*, the Ninth Circuit interpreted the United States Supreme Court's ruling in *Owens* as follows:

The Court provided that if there are multiple statutes of limitations for various types of personal injury claims, the residual statute of limitations for personal injury actions is to be applied. If there is no residual statute of limitations for personal injury claims, [only] then the general residual statute of limitations for all action is applicable.

869 F.2d at 426.

[14] PDF also argues that two Hawaii Supreme Court decisions support the application of HRS § 657–1(4) in this case. We disagree. In *Au v. Au*, 63 Haw. 210, 626 P.2d 173 (1981), the court considered which statute of limitations applied to a claim of fraudulent misrepresentation which induced the plaintiff to purchase a leaky home. The court stated that "HRS § 657–7 has been interpreted to apply to 'claims for damages resulting from *physical* injury to persons or *physical* injury to tangible interests in property.' " *Id.* at 216, 626 P.2d at 178 (emphasis in original)

tions period set forth in HRS § 657–7 applies to PDF's claims under § 1983.

The statute of limitation runs from the date that PDF's cause of action accrued — that is, when PDF discovered or should have discovered the breach of trust, the injury to its members, and the connection between the breach and the injury. *See* HRS § 657–7; *cf. Yamaguchi v. The Queen's Medical Center*, 65 Haw. 84, 90, 648 P.2d 689, 693–94 (1982). Here, the alleged breach of trust arose out of the subject land exchange. The State and Campbell exchanged deeds on December 23, 1985, but the exchange did not become effective until the legislature failed to disapprove it by April 23, 1986. PDF fails to challenge the lower court's finding that PDF officers and members knew of the land exchange by November 1985. Thus, PDF knew of the exchange on or before its effective date and the cause of action accrued on, and the statute of

---

(citations omitted). The court rejected the application of § 657–7, and opted instead for § 657–1(4) because the "nature of this claim [wa]s not the physical injury to property" and thus fell within the general limitations period for personal actions not specifically covered elsewhere. *Id.* at 216–17, 626 P.2d at 179. Nevertheless, personal injuries are covered elsewhere — in HRS § 657–7.

In *Higa v. Mirikitani*, 55 Haw. 167, 517 P.2d 1 (1973), the court stated that a claim for legal malpractice concerned a "*non–physical*" injury to an *intangible* interest of the plaintiff" and applied HRS § 657–1(1) based on an analogy to contract law. *Id.* at 170, 517 P.2d at 4.

PDF's argument would have us examine the "physical" or "non–physical" nature of the § 1983 action, hold that it is "non–physical," and thus hold that because it is more analogous to the claims in *Au* and *Higa*, HRS § 657–1 should be applied. However, the United States Supreme Court expressly rejected searching for the "most analogous" statute and directed that the personal injury statute should apply. *Owens*, 488 U.S. at 239–40. Even if the nature of the action were to be examined, it is clear that the Supreme Court meant *physical* injuries to persons. *See Wilson*, 471 U.S. at 276–77 (selection of personal injury statute was based on history of atrocities that concerned Congress in 1871, *i.e.* murders, whippings and lynchings).

limitations ran from, April 23, 1986.[15] The Complaint, filed on March 10, 1989, was untimely with respect to all claims under § 1983. Alternative grounds for the dismissal of these claims also merit discussion.

### D. *Res Judicata* effect of *Ulaleo*

The Ninth Circuit's decision in *Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990), and the doctrine of *res judicata* bar relitigation of PDF's § 1983 claims. To explicate this holding, we first review the basic tenets of *res judicata*. This court has consistently recognized that:

> The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided.

*Morneau v. Stark Enters., Ltd.*, 56 Haw. 420, 422–23, 539 P.2d 472, 474–75 (1975) (quoting *Ellis v. Crockett*, 51 Haw. 45, 55, 451 P.2d 814, 822 (1969) (quoting *In re Bishop Estate*, 36 Haw. 403, 416 (1943)).

In *Morneau*, we also commented on the implications of the doctrine of collateral estoppel:

> Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies. . . . Collateral estoppel also precludes relitigation of facts or issues pre-

---

[15] PDF's fourteenth amendment claims, brought under § 1983, also arise out of the subject land exchange. Therefore, this statute of limitations discussion is equally applicable to the fourteenth amendment claims.

> viously determined when it is raised defensively by one not a party in a prior suit against one who was a party in that suit and who himself raised and litigated the fact or issue.

56 Haw. at 423, 539 P.2d at 475 (citations omitted). These principles are tempered only by the prerequisite that a plaintiff have a full and fair opportunity to litigate the relevant issues. *See Morneau*, 56 Haw. at 421–22, 539 P.2d at 474; *see also Allen v. McCurry*, 449 U.S. 90, 95 (1980) (noting a long recognized exception that "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case").

There is no question that PDF brought an official capacity suit in federal court against the defendant BLNR members on nearly identical § 1983 claims, although in the present case PDF no longer asks the court to void the land exchange. PDF suggests that, because the Ninth Circuit did not reach the merits of the breach of trust claims in *Ulaleo*, there is no preclusive effect in this case. However, in dismissing that suit on eleventh amendment grounds, the court held that PDF sought retrospective relief against the State for the breach of the public lands trust. *Ulaleo*, 902 F.2d at 1398–1400. The finding that PDF sought retrospective relief is binding in this action. The significance of this binding effect is elucidated in our discussion of the State's sovereign immunity in Parts II. B. and II. C. of this opinion.

The Ninth Circuit ruling presents us with another facet of *res judicata*. That is, PDF may not escape the preclusive effect of the Ninth Circuit's ruling by advancing a different remedial theory. "The rule against splitting a cause of action is an aspect of *res judicata* and precludes the splitting of a single cause of action or an entire claim either as to the theory of recovery or the specific relief demanded." *Bolte v. Aits, Inc.*, 60 Haw. 58, 60, 587 P.2d 810, 812 (1978) (citations omitted). Therefore, we hold that PDF is barred

by the doctrine of *res judicata* from asserting its breach of § 5(f) trust and fourteenth amendment claims brought under § 1983.

## II. Other Breach of Trust Claims

In addition to its § 1983 claims, PDF asserts breach of trust claims under Hawaii law. PDF correctly argues that the State of Hawaii has acknowledged its fiduciary duties and obligations as trustee of the public lands trust in article XII, § 4 of the Hawaii Constitution. Article XVI, § 7 of the constitution mandates that the § 5(f) trust provisions "shall be complied with by appropriate legislation." The decision of this court will not render these provisions meaningless and will not leave the people of Hawaii without the means to hold their government to these promises. Therefore, we hold that PDF has a right to bring suit under the Hawaii Constitution to prospectively enjoin the State from violating the terms of the ceded lands trust. We further hold that PDF is not seeking to prospectively enjoin a constitutional violation in this case, but would have us turn back the clock and examine actions already taken by the State. The doctrine of sovereign immunity deters judges from this course in state as well as federal court.

### A. Right to Sue Under the Hawaii Constitution

The State argues that, because the Ninth Circuit ruled that the Admission Act creates no private implied right of action, there can be no private right of action to enforce the terms of the § 5(f) trust under Hawaii law. *See Keaukaha I*, 588 F.2d 1216 (1978), *cert. denied*, 444 U.S. 826 (1979). We disagree. We have held, in a variety of contexts, that this court is not precluded from finding that the Hawaii Constitution affords greater protection than required by similar federal constitutional or statutory provisions. *See, e.g., State v. Kam*, 69 Haw. 483, 748 P.2d 372 (1988); *Hawaii Hous. Auth. v. Lyman*, 68 Haw. 55, 704 P.2d 888 (1985); *State v. Tanaka*, 67 Haw. 658, 701 P.2d 1274 (1985); and *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984), *appeal after remand*, 69 Haw. 72, 734 P.2d 156 (1987).

First, we review the grounds for the Ninth Circuit's ruling in *Keaukaha I*. In reaching its conclusion that the Admission Act does not imply a private cause of action, the court analyzed the United States Supreme Court's interpretation of the Rail Passenger Service Act which permits suits by the United States Attorney General, or in some cases, railroad employees. *Keaukaha I*, 588 F.2d at 1220–21 (citing, *inter alia*, *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*, 414 U.S. 453 (1974)). The Supreme Court held that because the Rail Act creates only a public cause of action and a narrow private cause of action, the legislature intended these to provide the exclusive remedies. *Id.* This presumption of an exclusive remedy, known as the *expressio unius* principle, yields to both legislative intent and the effectuation of the purposes of a statute. *Id.* at 1221 (citations omitted).

The Ninth Circuit also applied the four factors articulated in *Cort v. Ash*, 422 U.S. 66 (1975), to the Admission Act. The first element, that plaintiff is a "member of the 'class for whose especial benefit the statute was enacted,' " was met. *Id.* at 1223. The second element, an indication of explicit or implicit legislative intent, was found to be lacking — the court applied the *expressio unius* presumption[16] and noted the "unusual" use of a state's admission act to create a right to sue. *Id.* at 1223. The third element, consistency with the underlying statutory scheme, was thought to be a "close question," but was found not to support a private cause of action because the court saw "no federal purpose to be served by reading a private cause of action into the Admission Act." *Id.* at

---

[16] The court found that given the lengthy consideration that Congress gave the Hawaii Admission Act, the *expressio unius* presumption was particularly appropriate. 588 F.2d at 1223 (Admission Act first proposed in 1919, 23 hearings, over 6,600 pages of testimony and exhibits, and more than 850 witnesses).

1224. The fourth element, whether the cause of action is one "traditionally relegated to the States, in an area basically the concern of the States," was "easily" concluded to militate against implying a private right to sue. *Id.* at 1222, 1224. As we noted earlier, the court found that action to be "a matter of state concern" and held it to be "most appropriate for Hawaii's laws and judicial system to deal with it." *Id.* at 1224.

We are of the view that, while these reasons were compelling in the context of the enforceability of a federal statute, they do not support a similar finding with respect to the enforcement of article XII, § 4 of the Hawaii Constitution. *Cf. Huihui v. Shimoda*, 64 Haw. 527, 531, 644 P.2d 968, 971 (1982) ("[I]t is our obligation to interpret and enforce the state constitution as the highest court of this sovereign state 'not in total disregard of federal interpretations . . . , but with reference to the wisdom of adopting these interpretations for our state.' "). Article XII, § 4 was added to the Hawaii Constitution to expressly recognize the trust purposes and trust beneficiaries of the § 5(f) trust, clarifying that the State's trust obligations extend beyond the Hawaiian Homes Land Trust. *See* Stand. Comm. Rep. No. 59, Constitutional Convention of 1978, 2–3. And, despite the Ninth Circuit's findings that no purpose would be served by allowing private enforcement of the ceded land trust in federal court, we find that protecting the res of the public lands trust, thereby enforcing the mandates of our constitution, is appropriate in our state courts. This consideration undermines the argument that access to an enforcement remedy for breach of trust should be held exclusively by the United States Attorney General.

We are also guided by our earlier decisions concerning lands held in public trust. In *Kapiolani Park Preservation Society v. City & County of Honolulu*, 69 Haw. 569, 751 P.2d 1022 (1988), we held that members of the public, as trust beneficiaries, could sue to prevent the trustee, a government agency, from disposing of trust lands through leases or deeds in contravention of the terms of

a charitable trust.[17] In *Kapiolani Park*, the court found that: (1) a government agency (the City) was the trustee of a public charitable trust; (2) the trustee did not file periodic accountings; (3) the trustee would not seek instructions of the court as to its duties; (4) a genuine controversy existed as to the trustee's power to enter into the lease transaction; and (5) the attorney general, as *parens patriae*, chose to support the City's actions, abandoning the defense of the possible rights of the public. *Id.* at 572, 751 P.2d at 1025. Under those circumstances, we held that unless members of the public could bring the matter to the attention of the court,

> "the citizens of this State would be left without protection, or a remedy . . . [and] the City, with the concurrence of the attorney general, would be free to dispose, by lease or deed, of all, or part of, the trust comprising Kapiolani Park, as it chose, without the citizens of the City and State having any recourse to the courts."

*Id.*

Although the case before us involves the ceded lands trust, rather than a charitable trust, the parallels are unmistakable.[18]

---

[17] *See also Natatorium Preservation Committee v. Edelstein*, 55 Haw. 55, 515 P.2d 621 (1973), wherein plaintiffs brought suit to (prospectively) enjoin the destruction of the Natatorium in violation of the executive order setting aside the public lands for the Natatorium and in violation of the procedural requirements of HRS § 171–11. Although a subsequent amendment to HRS § 171–11 superseded the court's holding with respect to the operation of that provision, the relevance of that case to the present controversy is unchanged. In effect, the *Natatorium* decision stands for the proposition that citizens can bring suit for an injunction against the government agencies charged with the management of public lands when those agencies seek to dispose of the public lands in violation of the statutes governing their management and disposition.

[18] *See also Ahuna v. Department of Hawaiian Home Lands*, 64 Haw. 327, 640 P.2d 1161 (1982). This case involved the Department's duties as trustee of Hawaiian home lands. The issue of whether the Hawaiian Homes Commission Act, which is incorporated into article XII, § 2 of the Hawaii Constitution, provides a private right of action was not addressed, because it was raised for the first

Here, we have a situation where the agency charged with the administration of a trust held for the benefit of native Hawaiians and members of the public has purportedly disposed of trust assets in violation of trust provisions and, if we were to adopt the position of the State, no one in the State of Hawaii would have the right to bring the matter before Hawaii's courts. As we said in *Kapiolani Park*, "[s]uch a result is contrary to all principles of equity and shocking to the conscience of the court." *Id.* at 573, 751 P.2d at 1025. Leaving aside for the moment the question of whether we can now review the State's consummated acts, we are of the firm conviction that our courts must be available to the citizens of Hawaii to avert such a purported breach of public trust.

We find that the actions of state officials, acting in their official capacities, should not be invulnerable to constitutional scrutiny. Article XII, § 4 imposes a fiduciary duty on Hawaii's officials to hold ceded lands in accordance with the § 5(f) trust provisions, and the citizens of the state must have a means to mandate compliance. This is not to say, however, that article XII, § 4 creates a waiver of sovereign immunity such that money damages are available. *See Figueroa v. State*, 61 Haw. 369, 604 P.2d 1198

---

time on appeal. *Id.* at 332–33, 640 P.2d at 1165. Nevertheless, the court determined the fiduciary duties that the government, as trustee, owed to the native Hawaiian beneficiaries of the trust. The court held, in part, that "the conduct of the government as trustee is measured by the same strict standards applicable to private trustees." *Id.* at 339, 640 P.2d at 1169 (citations omitted). The court applied this high standard of fiduciary duty to the government in deciding whether: (1) the trustee administered the trust solely in the interest of the beneficiaries; and (2) whether the trustee used reasonable skill and care to make trust property productive. *Id.* at 340, 640 P.2d at 1169. The court agreed with the Department that "a trustee must deal impartially when there is more than one beneficiary," but held that the trustees "failed to sufficiently demonstrate that they considered the interests of all beneficiaries." *Id.*, 640 P.2d at 1170.

The State owes this same high standard to the beneficiaries of the ceded lands trust and, as stated in the text, the beneficiaries of this trust should not be left powerless to prevent the State from allegedly neglecting its obligations.

(1979) (although a constitutional provision establishes enforceable rights or duties, it does not necessarily create a waiver of sovereign immunity). Nevertheless, as discussed in the following section, sovereign immunity may not always provide a defense for state officials when their actions are attacked as being unconstitutional. *See, e.g., W.H. Greenwell, Ltd. v. Department of Land and Natural Resources,* 50 Haw. 207, 209, 436 P.2d 527, 528 (1968). Thus, we hold that PDF, whose members are beneficiaries of the trust, may bring suit for the limited purpose of enjoining state officials' breach of trust by disposal of trust assets in violation of the Hawaii constitutional and statutory provisions governing the public lands trust.

## B. Sovereign Immunity

PDF argues that sovereign immunity is not a bar to suit for injunctive relief when state officials acting in their official capacities act *ultra vires* of state and federal law. While we agree with this legal proposition, we disagree with PDF's further argument that the Ninth Circuit's rulings on the strictures of the eleventh amendment are not relevant to our own principles of sovereign immunity. On the contrary, the eleventh amendment is the federal constitutional embracement of the common law doctrine of sovereign immunity;[19] it makes the doctrine applicable to the federal courts. *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 67 (1989) (citations omitted) (In discussing whether Congress

---

[19] Although the language of the eleventh amendment expressly governs actions against a state brought by citizens of another state, the U.S. Supreme Court has long held that the amendment also bars suits against a state by its own citizens. *See Hans v. Louisiana,* 134 U.S. 1 (1890); *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47 (1944); *Edelman v. Jordan,* 415 U.S. 651 (1974). The eleventh amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U.S. Const. amend. XI.

intended to abrogate eleventh amendment immunities in § 1983 actions, the Court stated that "members of the 42d Congress were familiar with common–law principles . . . [and t]he doctrine of sovereign immunity was a familiar doctrine at common law."); *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citations omitted) ("The Eleventh Amendment confirms that 'fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' .").

In *W.H. Greenwell, Ltd. v. Department of Land and Natural Resources*, 50 Haw. 207, 436 P.2d 527 (1968), we discussed Hawaii's sovereign immunity doctrine in a suit to enjoin DLNR's planned release of axis deer on the Big Island, allegedly in violation of the plaintiff's rights under the state and federal constitutions. The court held that:

> It is the unquestioned rule that the State cannot be sued without its consent or waiver of its immunity in matters "involving the enforcement of contracts, treasury liability for tort, and the adjudication of interest [sic] in property which has come unsullied by tort into the bosom of government." . . . [However,] sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of government when their action is attacked as being unconstitutional.

*Id.* at 208–09, 436 P.2d at 528 (citations omitted). Nor will sovereign immunity bar suits to enjoin state officials from violating state statutes. *See, e.g., Natatorium Preservation Committee v. Edelstein*, 55 Haw. 55, 515 P.2d 621 (1973).

Subsequent decisions have further illustrated that the sovereign State is immune from suit for money damages, except where there has been a "clear relinquishment" of immunity and the State has consented to be sued. *See Washington v. Fireman's Fund Ins. Cos.*, 68 Haw. 192, 198, 708 P.2d 129, 134 (1985), *cert. denied*, 476 U.S. 1169 (1986) (Acknowledging its earlier ruling in

*Greenwell,* the court held that sovereign immunity was a bar to plaintiff's action because it "does not involve an action seeking only to enjoin state officials from acting unconstitutionally." (Citations omitted)); *Big Island Small Ranchers Ass'n v. State,* 60 Haw. 228, 236, 588 P.2d 430, 436 (1978) (Plaintiffs' chapter 480 damages claims were held to be barred by sovereign immunity, because "the legislature has not made Chapter 480 explicitly applicable to the State, and since none of the allegations in the complaint claim that the State has consented to be sued upon this chapter, appellants can claim no relief under this theory." *Makanui v. Department of Educ.,* 6 Haw. App. 397, 405–07, 721 P.2d 165, 171–72 (1986) (The ICA held that Hawaii had not waived its sovereign immunity from § 1983 damages liability, and those claims against the state and state officials in their official capacities were therefore barred.[20] *See also* HRS chs. 661, 662, 673 and 674 (waiving the State's sovereign immunity in certain cases).

This court has not previously tested the scope of the exception to the sovereign immunity doctrine recognized in *Greenwell.* We must do so in this case because, on its face, PDF's complaint requests only injunctive and declaratory relief, and not damages, against state officials acting in their official capacities. The *Greenwell* exception has its genesis in *Ex parte Young,* 209 U.S. 123

---

[20] *Accord Will v. Michigan Dep't of Police,* 491 U.S. 58 (1989). Noting that the eleventh amendment does not apply in state courts, the United States Supreme Court addressed the question of whether a state is a "person" under § 1983. The Court held that a state is not a person within the meaning of § 1983, nor is a state official, when acting in his official capacity, because such a suit is really a suit against the official's office, which is a suit against the state. Nevertheless, the Court twice distinguished *Will* from cases seeking only injunctive relief: (1) "In *Jefferson County,* the Court held that States were persons . . . [b]ut the plaintiff there was seeking only injunctive relief and not damages against the State defendant . . . ," 491 U.S. 64–65 n.5; and (2) "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official capacity actions for prospective relief are not treated as actions against the State.' " 491 U.S. at 71 n.10 (citations omitted).

(1908), which first held that the eleventh amendment does not bar a suit to enjoin as unconstitutional a state official's actions. *See Greenwell*, 50 Haw. at 209, 436 P.2d at 528. *Young* has been the subject of many subsequent decisions to which we turn for guidance.

The rule in *Young*, which we adopt, makes an important distinction between prospective and retrospective relief.[21] If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. *See, e.g., Papasan v. Allain*, 478 U.S. 265, 278 (1986); *Green v. Mansour*, 474 U.S. 64, 68 (1985). This is true "even though accompanied by a substantial ancillary effect on the state treasury." *Papasan*, 478 U.S. at 278 (citations omitted).[22] However, relief that is "tantamount to an award of damages for a past viola-

---

[21] Application of the rule in *Young* differs slightly in state and federal court because the federal courts are primarily concerned with vindicating federal rights and holding state officials "responsible to 'the supreme authority of the United States.' " *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. at 160). In federal court, an eleventh amendment defense might prevail where officials are alleged to be violating state law alone. *Id.* at 104–06. In state court, we are equally concerned with violations of Hawaii law, whether constitutional or statutory, and sovereign immunity will not preclude suits brought to enjoin such illegalities.

[22] In *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court discussed two cases in which injunctive relief was found to have a permissible, ancillary effect on state treasuries:

[T]he fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous conduct. Such an ancillary effect on the state treasury is often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

*Id.* at 667–68 (referring to *Graham v. Richardson*, 403 U.S. 365 (1971), and *Goldberg v. Kelly*, 397 U.S. 254 (1970), cases in which welfare officials were enjoined from denying or terminating certain benefits). In *Edelman*, the Court

tion of . . . law, even though styled as something else," is barred by sovereign immunity. *Id.*

As the Ninth Circuit observed in *Ulaleo*, "[s]imply asking for injunctive relief and not damages *does not* clear the path for suit. The Supreme Court has recognized that the difference between retrospective and prospective relief 'will not in many instances be that between day and night.' " *Ulaleo*, 902 F.2d at 1399 (quoting *Edelman v. Jordan*, 415 U.S. 651, 667 (1974)). In the case before us, PDF has styled its prayer for relief as one for declaratory and injunctive relief, yet the question remains whether the effect on the state treasury would be "ancillary" or would amount to virtual compensation for the past misconduct of state officials.

The claims for restoration of the Puna lands, via a constructive trust, are comparable to the claims that the U.S. Supreme Court held to be retrospective in *Papasan*, in which the plaintiffs argued that the sale of certain school trust lands in the 1850's, and the unwise investment of the proceeds, had violated the trust obligation to hold those lands for the benefit of the area's schoolchildren. 478 U.S. at 274. Plaintiffs sought: (1) a declaration that the state legislation implementing the land sales was void and unenforceable; (2) establishment of a fund to be held in trust for plaintiffs' benefit; or, alternatively, (3) other lands of the same value to be made available to the plaintiffs. *Id.* at 274–75.

The plaintiffs in *Papasan* argued that they only sought a prospective, injunctive remedy by requiring the state officials to provide appropriate trust income. *Id.* at 279. The Court held that "continuing payment of the income from the lost corpus is essentially equivalent in economic terms to a one–time restoration of the lost corpus" and no different than a monetary award, thus violative of the eleventh amendment. *Id.* at 281.

---

held that the eleventh amendment barred "equitable restitution" for improperly denied benefits, because it was indistinguishable from an award of damages. 415 U.S. at 668–71.

In the instant case, PDF's request that the trust status of the exchanged lands be restored by means of a constructive trust is "essentially equivalent" to a nullification of the exchange and the return of the exchanged lands to the trust res. The effect on the state treasury would be direct and unavoidable, rather than ancillary, because imposing a constructive trust on lands now held by Campbell would require the State to compensate Campbell for its property. *See* U.S. Const. amend. V; Haw. Const. art. I, § 20. We therefore hold that PDF's requested relief is, in effect, a request for compensation for the past actions of the BLNR members. All of PDF's claims against the defendant state officials which are based on the alleged illegality of the subject land exchange, on either constitutional or statutory grounds, are barred by the State's sovereign immunity.[23]

### C. Collateral Estoppel Effect of *Ulaleo*

In addition to our own conclusion that PDF seeks retrospective relief which is barred by sovereign immunity, we are bound by the Ninth Circuit's adjudication in *Ulaleo*, in which the Ninth Circuit held:

> The Complaint is that sometime in the past, the BLNR undertook an action, the land exchange, which allegedly

---

[23] The affected claims include: (1) breach of trust claims under article XII, § 4; (2) due process claims under article I, § 5; (3) violation of article XII, § 7 by the relinquishment of state lands; (4) violation of HRS §§ 171–26 and 171–50; and (5) violation of HRS chapter 195. This opinion in no way implies that this court condones the actions of the BLNR in this case. For example, were the questions properly before us, we might well have occasion to hold that: (1) chapter 195 provides greater protection for NARS designated public lands than the more general public lands provisions in chapter 171; (2) that § 195–1 declares the legislative intent to set aside and administer certain "unique natural assets" solely for the purposes of protecting and preserving them for future generations; (3) that designated lands were to be preserved "in perpetuity;" and (4) that until the 1987 amendments to this chapter, there was no provision allowing alienation of NARS land.

injured the plaintiffs by violating the trust of which the plaintiffs are beneficiaries. . . . The immediate relief plaintiffs seek would require the state to purchase the lands from its present holder by way of cash or other land. We hold that to grant the requested relief would be a retrospective remedy . . . . If the trust duty was violated, it happened when the BLNR executed the exchange.

*Ulaleo*, 902 F.2d at 1399–1400. Thus, the judgment of a court of competent jurisdiction has previously determined the retrospective nature of PDF's "illegal land exchange" claims, and the state courts are precluded from relitigating this issue in the context of PDF's state law claims. *See, e.g., Morneau v. Stark Enters.*, 56 Haw. at 423, 539 P.2d at 475 (collateral estoppel precludes the relitigation of an issue which was decided in a prior suit on a different claim). PDF had a "full and fair opportunity" to argue that it was in fact seeking prospective relief, and reframing its prayer for relief does not entitle it to reargue claims based on the allegedly illegal land exchange. *See Bolte v. Aits, Inc.*, 60 Haw. 58, 587 P.2d 810 (1978); *see also Allen v. McCurry*, 449 U.S. 90 (1980) (holding that a federal court cannot relitigate an issue already decided in state court when the party against whom the earlier decision is asserted had a full and fair opportunity to litigate that issue in the earlier case).[24]

In light of our rulings that PDF's breach of trust claims are barred by sovereign immunity and the preclusive effect of *Ulaleo*, we need not reach the question of whether this court's decision in *Dedman v. BLNR*, 69 Haw. 255, 740 P.2d 28 (1987), *cert. denied*,

---

[24] We recognize that the PDF's pendent state law claims were not fully litigated in federal court; rather they were barred because, after the § 1983 claims were dismissed, the justification under *Ex parte Young* for adjudicating them in federal court no longer existed. *See* 902 F.2d at 1400; *see also supra* note 21.

485 U.S. 1020 (1988), also bars relitigation of claims arising out of the land exchange.[25]

### D. Indispensable Parties

Campbell and True argue that the State is an indispensable party to any claim arising out of the land exchange. We agree. First, as alleged by the defendants, PDF has failed to appeal from the lower court's conclusion of law ruling that the State is an indispensable party to the breach of trust claims against Campbell and True. Issues not properly raised on appeal will be deemed to be waived. *Mahiai v. Suwa*, 69 Haw. 349, 354, 742 P.2d 359, 364 (1987); *Meyer v. City & County of Honolulu*, 6 Haw. App. 505, 513–14, 729 P.2d 388, 395, *aff'd in part, rev'd in part on other grounds*, 69 Haw. 8, 731 P.2d 149 (1986). Additionally, we find that there is no adequate remedy available for the alleged breaches of trust absent the trustee–State's participation.

### III. *Kalipi* Rights

PDF argues that article XII, § 7 of the Hawaii Constitution was violated in two ways: (1) by the *relinquishment of state lands* on which native Hawaiians customarily and traditionally exercised subsistence, cultural and religious practices; and (2) by the continued *denial of access* into Wao Kele 'O Puna to native Hawaiian PDF members who seek access for customarily and traditionally exercised subsistence, cultural and religious practices.

The former claim, which arises out of the land exchange between the State and Campbell, is barred by the State's sovereign immunity. *See* Part II. B., *supra*. Regardless of its constitutional

---

[25] Although PDF was not a party in *Dedman*, two of PDF's founding members were plaintiffs in that case and the defendants here argue that PDF and the *Dedman* plaintiffs are "in privity" with respect to the issues before the court. For a discussion of the privity issue, *see, e.g., United States v. ITT Rayonier, Inc.*, 627 F.2d 996 (9th Cir. 1980); *Jackson v. Hayakawa*, 605 F.2d 1121 (9th Cir. 1979), *cert. denied*, 445 U.S. 952 (1980).

or statutory basis, any claim seeking to restore trust beneficiaries to the position they occupied prior to the exchange is retrospective in nature and cannot be brought against the State.[26] The latter claim, however, is independent of the land exchange and merits further analysis.

### A. Standing

PDF argues that it has standing to bring suit on behalf of its native Hawaiian members under article XII, § 7 of the Hawaii Constitution. We agree for many of the same reasons that we held that PDF could bring breach of trust claims on behalf of its members. *See* Part I. B., *supra.*

It is undisputed that the rights of native Hawaiians are a matter of great public concern in Hawaii. This court has repeatedly demonstrated its fundamental policy that Hawaii's state courts should provide a forum for cases raising issues of broad public interest,[27] and that the judicially imposed standing barriers should be lowered when the "needs of justice" would be best served by allowing a plaintiff to bring claims before the court. *Life of the Land v. The*

---

[26] Additionally, as should be apparent from the ensuing discussion of article XII, § 7 and *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982), the "*Kalipi* rights" of a native Hawaiian do not depend on who owns the subject land. In other words, if a native Hawaiian has the right to enter the land of another, the transfer of ownership *alone* does not extinguish those native Hawaiian rights. Concomitantly, the existence of native Hawaiian rights to enter a particular parcel of land does not burden a landowner's right to transfer his or her interest in the land.

[27] This policy is, of course, limited to judicially cognizable claims. For example, we will not hear claims lacking allegations of concrete injuries and merely asserting the value preferences of the plaintiffs. *See, e.g., Hawaii's Thousand Friends*, 70 Haw. at 283–84, 768 P.2d at 1299. Nor shall we try to settle "political questions" which must be resolved by the political branches of government. *See, e.g., Trustees of Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 737 P.2d 446, *cert. denied*, 484 U.S. 898 (1987); *Baker v. Carr*, 369 U.S. 186, 217 (1962) (cited in *Board of Educ. v. Waihee*, 70 Haw. 253, 768 P.2d 1279 (1989)).

*Land Use Comm'n*, 63 Haw. 166, 176, 623 P.2d 431, 441 (1981) ("Our touchstone remains 'the needs of justice.' "); *see also Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982); *In re Application of Hawaiian Elec. Co.*, 56 Haw. 260, 535 P.2d 1102 (1975).

As discussed earlier in this opinion, the needs of justice can be served only by recognizing plaintiffs that have a sufficient personal stake in the outcome of the litigation. This is measured by the three–part "injury in fact" test set out in *Akau*, and followed in *Hawaii's Thousand Friends*. *Akau*, 65 Haw. at 389, 652 P.2d at 1134–35 (citations omitted); *Hawaii's Thousand Friends*, 70 Haw. at 283, 768 P.2d at 1299. Applying this test to PDF's article XII, § 7 claim, we find that PDF has adequately alleged that: (1) its members include native Hawaiians who are being injured by their exclusion from the undeveloped areas of the land now held by Campbell and True; [28] (2) the injuries are traceable to the alleged violation of their "*Kalipi* rights;" and (3) injunctive relief is likely to remedy the injuries by requiring defendants to allow native Hawaiians access to undeveloped areas of the exchanged lands. [29] Therefore, we hold that PDF, a non–profit corporation whose

[28] Campbell argues on appeal that PDF fails to allege that its membership includes persons who are of fifty percent or more Hawaiian blood *and* who have gone to Wao Kele 'O Puna and the Puna Forest Reserve in the exercise of traditional and customary rights. However, Campbell does not challenge the trial court's finding of fact that PDF alleges, and supports by affidavit, that "its membership include[s] persons who are of fifty percent (50%) or more Hawaiian blood who live in certain ahupua'a abutting but not in Wao Kele 'O Puna." We will not disturb this finding. *See Mahiai*, 69 Haw. at 354, 742 P.2d at 364.

[29] Although not essential to our holding, we also observe that "the needs of justice" in this particular case are best served by allowing PDF to maintain standing in light of the lower court's seemingly contradictory rulings in this case. On November 11, 1990, the court denied Emily Naeole's motion to intervene because her "interests and claims are well–represented by the Pele Defense Fund." Nevertheless, on February 14, 1991, the court concluded that "PDF further failed to satisfy all or even a part of the three–part test for determining whether it had standing

stated purpose is to perpetuate Hawaiian religion and culture, has standing to assert a violation of article XII, § 7 on behalf of its members.

## B. Extension of *Kalipi*

PDF challenges the circuit court's dismissal of its claim that PDF's native Hawaiian members were entitled under Article XII, § 7 to enter Wao Kele ʻO Puna and the Puna Forest Reserve to exercise traditional and customary rights. The basis of PDF's claim is that Wao Kele ʻO Puna historically served as a common gathering area which could be utilized by tenants who resided in ahupuaʻa abutting Wao Kele ʻO Puna. Accordingly, PDF argues that its members should not need to establish that they are "lawful occupants" of Wao Kele ʻO Puna, although they must establish that they are tenants of ahupuaʻa abutting Wao Kele ʻO Puna and have traditionally used Wao Kele ʻO Puna for gathering and other native Hawaiian practices.

To determine the efficacy of this claim, we first review article XII, § 7 and the landmark opinion written by Chief Justice Richardson in *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982). *Kalipi* defined the rudiments of native Hawaiian rights protected by article XII, § 7, commonly known as *"Kalipi* rights." We now further explicate the scope of these rights under the Hawaii Constitution. Article XII, § 7 provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

---

to bring the pending suit on behalf of its members." A person obviously cannot be "well–represented" by one who lacks standing to bring claims on that person's behalf.

Haw. Const. art. XII, § 7 (1978).

We first addressed this constitutional provision in *Kalipi*, 66 Haw. 1, 656 P.2d 745 (1982). Kalipi sought to exercise traditional gathering rights in the Molokai ahupua'a of Ohia in which he owned a houselot. *Id.* at 3, 656 P.2d at 747. [30] Kalipi did not reside on the property, although he lived in the nearby Keawenui ahupua'a. *Id.* Kalipi turned to three sources to support his claimed rights: (1) HRS § 7–1; [31] (2) HRS § 1–1; [32] and (3) the "kuleana" reservation in the title to the lands in question. *Id.* at 4, 656 P.2d at 747. The court looked to article XII, § 7 for its "obligation to preserve and enforce such traditional rights." *Id.* at 4–5, 656 P.2d at 748.

We held that HRS § 7–1 contains two types of rights: "gathering rights which are specifically limited and enumerated, and rights to access and water which are framed in general terms." *Id.*

---

[30] Kalipi also sought to exercise traditional gathering rights in the ahupua'a of Manawai in which he owned a taro patch. *Kalipi*, 66 Haw. at 3, 656 P.2d at 747. For discussion purposes, we refer only to rights associated with the houselot in the Ohia ahupua'a.

[31] HRS § 7–1 (1985), a statute initially passed in 1851, provides:

Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house–timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and roads shall be free to all, on lands granted in fee simple; provided that this shall not be applicable to wells and water-courses, which individuals have made for their own use.

[32] HRS § 1–1 (1985) (emphasis added) provides:

The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States or by the laws of the State, or fixed by Hawaiian judicial precedent, *or established by Hawaiian usage*; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

at 5, 656 P.2d at 748. With respect to these rights, we stated that "lawful occupants of an ahupuaa may, for the purposes of practicing native Hawaiian customs and traditions, enter undeveloped lands within the ahupuaa to gather those items enumerated in the statute." *Id.* at 7–8, 656 P.2d at 749. The "undeveloped lands" limitation was imposed by the court to balance the concept of land ownership with that of native rights. *Id.* Because Kalipi asserted his rights based on ownership of land and not residence in the ahupua'a, we held that he was not entitled to exercise native gathering rights in Ohia. *Id.* at 9, 656 P.2d at 750.

We further held that HRS § 1–1's "Hawaiian usage" clause may establish certain customary Hawaiian rights beyond those found in HRS § 7–1. *Id.* at 9–10, 656 P.2d at 750. Thus, we "believe that the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." *Id.* at 10, 656 P.2d at 751. Noting testimony that "there have continued in certain ahupuaa a range of practices associated with the ancient way of life which required the utilization of the undeveloped property of others and which were not found in § 7–1," we held that HRS § 1–1 insures the continuance of these enduring practices "for so long as no actual harm is done thereby." *Id.*

With respect to Kalipi we held that, regardless of the source of his asserted rights, he was not entitled to exercise them because he did not live in the ahupua'a in which he sought to assert his claimed rights. *Id.* at 13, 656 P.2d at 752.

Like Kalipi, PDF members assert native Hawaiian rights based on article XII, § 7 and HRS § 1–1 in an ahupua'a other than the ones in which they reside. Unlike Kalipi, PDF members claim these rights based on the traditional access and gathering patterns of native Hawaiians in the Puna region. Because Kalipi based his claims entirely on land ownership, rather than on the

practiced customs of Hawaiians on Molokai, the issue facing us is somewhat different from the issue in *Kalipi*. In *Kalipi*, we foresaw that "[t]he precise nature and scope of the rights retained by § 1–1 would, of course, depend upon the particular circumstances of each case." 66 Haw. at 12, 656 P.2d at 752.

Thus, we upheld the rights of native Hawaiians to enter undeveloped lands owned by others to practice continuously exercised access and gathering rights necessary for subsistence, cultural or religious purposes so long as no actual harm was done by the practice. As found by the *Kalipi* court, and reported by the Constitutional Convention committee that drafted article XII, § 7, these rights are associated with residency within a particular ahupua'a. *See* Stand. Comm. Rep. No. 57, *reprinted in* 1 *Proceedings of the Constitutional Convention of Hawaii of 1978*, 637.[33]

The Committee on Hawaiian Affairs added what is now article XII, § 7 to reaffirm customarily and traditionally exercised rights of native Hawaiians, while giving the State the power to regulate these rights. *Id.* at 639. Although these rights were primarily associated with tenancy within a particular ahupua'a, the committee report explicitly states that the new section "reaffirms *all* rights customarily and traditionally held by ancient Hawaiians." *Id.* at 640 (emphasis added). The committee contemplated that some traditional rights might extend beyond the ahupua'a; "[f]or instance, it was customary for a Hawaiian to use trails outside the ahupua'a in which he lived to get to another part of the Island." *Id.* The committee intended this provision to protect the broadest possible spectrum of native rights:

> Your Committee also decided that it was important
> to eliminate specific categories of rights so that the courts

---

[33] The committee reported that "[a]lthough a tenant may not own any land in the ahupua'a, since these rights are personal in nature, as a resident of the ahupua'a, he may assert any traditional and customary rights necessary for subsistence, cultural or religious purposes." 1 *Proceedings, supra*, at 640.

or legislature would not be constrained in their actions. *Your Committee did not intend to remove or eliminate* any statutorily recognized rights or *any rights of native Hawaiians from consideration under this section, but rather your Committee intended to provide a provision in the Constitution to encompass all rights of native Hawaiians, such as access and gathering. Your Committee did not intend to have the section narrowly construed or ignored by the Court.* Your Committee is aware of the courts' unwillingness and inability to define native rights, but in reaffirming these rights in the Constitution, your Committee feels that badly needed judicial guidance is provided and enforcement by the courts of these rights is guaranteed.

*Id.* at 640 (emphasis added).

If, as argued by PDF,[34] the customary and traditional rights associated with tenancy in an ahupua'a extended beyond the boundaries of the ahupua'a, then article XII, § 7 protects those rights as well. The drafters of the constitutional amendment emphasized that *all* such rights were reaffirmed and that they did not intend for the provision to be narrowly construed. We therefore hold that native Hawaiian rights protected by article XII, § 7 may extend beyond the ahupua'a in which a native Hawaiian resides where such rights have been customarily and traditionally exercised in this manner.

PDF has presented evidence supporting the contention that the access and gathering patterns of tenants in Puna do not appear to have conformed to the usual notion that tenants exercised such

---

[34] These arguments are supported by the affidavits of Dr. Davianna McGregor, an Assistant Professor of Ethnic Studies at University of Hawaii at Manoa, and Emily Naeole and Clarence Hauanio, PDF members of more than 50% Hawaiian blood and residents of Maku'u and Kalapana, ahupua'a abutting Wao Kele 'O Puna.

rights only within the boundaries of a given ahupua'a. Affidavits suggest that Puna region ahupua'a tenants accessed all portions of the Puna Forest Reserve for hunting and gathering, and were not limited to just the narrow corridor of their ahupua'a. The practice of accessing the area as a common area for gathering and hunting by tenants of the Puna district may have commenced from the time of the Great Mahele and Kuleana Acts. One affiant testified that early trails accessed the Puna Forest Reserve from many ahupua'a, the lava tube extending into the Puna Forest Reserve extends across several ahupua'a and has entry points in more than one ahupua'a, and this area was associated with Pele and her family,[35] and not with any particular ahupua'a.

Based on the evidence before the trial court, we find that there are genuine issues of material fact with respect to PDF's claim under article XII, § 7.[36] If it can be shown that Wao Kele 'O Puna was a traditional gathering area utilized by the tenants of the abutting ahupua'a, and that the other requirements of *Kalipi* are met in this case, then PDF members such as Ms. Naeole may have a right to enter the undeveloped areas of the exchanged lands to exercise their traditional practices. At a full trial on the merits, PDF will have an opportunity to develop the facts and present evidence to support its claim. Therefore, the summary judgment is reversed and the matter remanded for trial on this issue.

## IV. Waiver of the Right to Free Association

PDF does not raise as error the circuit court's conclusion that PDF's right to free association under the first amendments of the

---

[35] Pele is an akua or goddess.

[36] We reiterate our early holding that article XII, § 7 *does not* require the preservation of Wao Kele 'O Puna and the (former) Puna Forest Reserve lands in their natural state. *Kalipi* rights only guarantee access to undeveloped land, under the specified circumstances, but they do not ensure that any particular lands will be held for the exercise of native Hawaiian customs.

U.S. and Hawaii Constitutions has not been violated. We have previously held that an appellant waives or abandons any challenge to matters not raised on appeal. *Mahiai v. Suwa*, 69 Haw. 349, 354, 742 P.2d 359, 364 (1987); *Meyer v. City & County of Honolulu*, 6 Haw. App. 505, 513–14, 729 P.2d 388, 395, *aff'd in part, rev'd in part on other grounds*, 69 Haw. 8, 731 P.2d 149 (1986). Thus, PDF has waived its first amendment arguments.

## V.   Conclusion

In summary, we reverse in part and remand for trial on the claim alleging that defendants violated article XII, § 7 by the continued denial of access into the undeveloped areas of Wao Kele 'O Puna and other exchanged lands to native Hawaiian PDF members who seek access for customarily and traditionally exercised subsistence, cultural and religious practices. We affirm the judgment of the lower court in all other respects for the reasons set forth in this opinion.

*Alan T. Murakami* (*Melody K. MacKenzie, Paul Nahoa Lucas, Yuklin Aluli* and *Steven C. Moore* with him on the briefs of Native Hawaiian Legal Corp.) for appellant.

*William M. Tam*, Deputy Attorney General, for appellee State.

*James K. Mee* (*Paul S. Aoki* and *Keith M. Yonamine* with him on the brief of Ashford & Wriston) for appellees Campbell Estate and Cornuelle.

*Gary B.K.T. Lee* (*Stephanie A. Rezents, Jason M. Yoshida*, and Law Clerk *Curtis T. Tabata* with him on the brief of Matsubara Lee & Kotake) for appellees True Geothermal Energy Corp., True Geothermal Drilling Co., and Mid–Pacific Geothermal, Inc.